# 22-2908(L)

### 22-2972 (CON)

## United States Court of Appeals
## for the Second Circuit

IVAN ANTONYUK, COREY JOHNSON, ALFRED TERRILLE, JOSEPH MANN, LESLIE LEMAN, and LAWRENCE SLOANE,

*Plaintiffs-Appellees,*

*against*

STEVEN A. NIGRELLI, in his Official Capacity as Acting Superintendent of the New York State Police, MATTHEW J. DORAN, in his Official Capacity as the Licensing official of Onondaga County, and JOSEPH CECILE, in his Official Capacity as the Chief of Police of Syracuse,

*Defendants - Appellants,*

[*caption continued on inside cover*]

On Appeal from the United States District Court
for the Northern District of New York

## BRIEF FOR AMICUS CURIAE CITY OF NEW YORK
## IN SUPPORT OF APPELLANTS AND REVERSAL

RICHARD P. DEARING
CLAUDE S. PLATTON
ELINA DRUKER
*of Counsel*

January 17, 2023

HON. SYLVIA O. HINDS-RADIX
*Corporation Counsel*
*of the City of New York*
Attorney for Amicus, City of New York
100 Church Street
New York, New York 10007
212-356-2605 or -2502
edruker@law.nyc.gov

[*continued caption*]

*and*

KATHLEEN HOCHUL, in her Official Capacity as Governor of the State of New York, WILLIAM FITZPATRICK, in his Official Capacity as the Onondaga County District Attorney, EUGENE CONWAY, in his Official Capacity as the Sheriff of Onondaga County, P. David SOARES, in his Official Capacity as the District Attorney of Albany County, GREGORY OAKES, in his Official Capacity as the District Attorney of Oswego County, DON HILTON, in his Official Capacity as the Sheriff of Oswego County, and JOSEPH STANZIONE, in his Official Capacity as the District Attorney of Greene County,

*Defendants.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ii

INTEREST OF AMICUS CURIAE AND SUMMARY OF ARGUMENT ............................................................................... 1

ARGUMENT .......................................................................... 5

POINT I................................................................................... 5

THE DISTRICT COURT FAILED TO GIVE WEIGHT TO LOCAL LAWS WHEN SEARCHING FOR A TRADITION OF FIREARM REGULATION ........................................................ 5

POINT II ............................................................................... 18

THE DISTRICT COURT ERRED BY REQUIRING HISTORICAL ANALOGUES FOR THE ESSENTIAL-TEMPERAMENT STANDARD AND RELATED DISCLOSURE REQUIREMENTS ................................................. 18

CONCLUSION ...................................................................... 28

CERTIFICATE OF COMPLIANCE ....................................... 29

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Avery v. Midland Cty.*,
   390 U.S. 474 (1968) ...................................................................9

*Bute v. Illinois*,
   333 U.S. 640 (1948) ...................................................................9

*Clinton v. Cedar Rapids & M. R. R. Co.*,
   24 Iowa 455 (1868) ................................................................ 14

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ...................................................... *passim*

*People ex rel. Leroy v. Hurlbut*,
   24 Mich. 44 (Mich. 1871) ................................................ 10, 14

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) ...................................................................7

*Mosby v. Devine*,
   851 A.2d 1031 (R.I. 2004) .................................................... 22

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   142 S. Ct. 2111 (2022) ................................................... *passim*

*People v. Kerr*,
   27 N.Y. 188 (1863) ................................................................ 14

**Statutes and Local Laws**

3rd Ann. Rep. of the Park Comm'rs of the City of Lynn 23
   (1891) ................................................................................... 15

1895 Mich. Pub. Acts 596 ....................................................... 15

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

1784 N.Y. Laws 627, An Act to Prevent the Danger Arising from the Pernicious Practice of Lodging Gun Powder in Dwelling Houses, Stores, or Other Places within Certain Parts of the City of New York, or on Board of Vessels within the Harbour Thereof, ch. 28 .................................................... 11

A Law to Prevent the Firing of Guns in the City of N.Y., ch. XXIII, § 1 (1803) ................................................................ 12

Compiled Ordinances of the City of Grand Rapids 163, § 432 (1907) (enacted 1891, amended 1892 & 1897) ................................ 15

City of Trenton, N.J., Charter & Ordinances 390 (1903) (enacted 1890) .................................................................. 15

Charter of the City of Wilmington, Rules and Regulations of the Board of Park Commissioners, Part VII, § 7 (1893) .................. 15

Colo. Rev. Stat. § 18-12-203(2) .................................................. 22

Concealed Carry Improvement Act, L. 2022, ch. 371, §§ 1, 23 ....... *passim*

Conn. Gen. Stat. §29-28(b) (2021) .............................................. 21

Del. Code, Tit. 11, § 1441 (2022) ........................................... 21, 22

Digest of the Acts of Assembly Relating to & the Gen. Ordinances of the City of Pittsburgh 496 (1897) (enacted 1893) .................................................................... 15

Digest of the Laws & Ordinances for the Gov't of the Mun. Corp. of the City of Reading, PA 240 (1897) ...................... 15

Gen. Ordinances of the City of Indianapolis 648, § 1971 (1904) (enacted 1896) ...................................................... 15

iii

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Laws & Ordinances Governing the Vill. of Hyde Park 310
(1876) (enacted 1875) ............................................................. 15

Laws & Ordinances for the Gov't of the Mun. Corp. of the
City of Williamsport, Pa. 141 (1891) .................................... 15

Laws & Ordinances of the City of Peoria, Illinois 667 (1892) ............... 15

Mun. Code of Chicago, 391, § 1690 (1881) .............................................. 15

Mun. Code of the City of Spokane, Wash. 123 (1903) (enacted
1892) ...................................................................................... 15

N.Y. Penal Law § 400.00 ................................................................ *passim*

N.Y. City, N.Y. (1763), A Law for the Better Securing of the
City of New York from the Danger of Gun Powder,
reprinted in *Laws, Statutes, Ordinances and
Constitutions, Ordained, Made and Established, by the
Mayor, Aldermen, and Commonalty, of the City of New
York, Convened in Common-Council, for the Good Rule
and Government of the Inhabitants and Residents of the
Said City* ............................................................................... 11

Ordinances of the City of N.Y., § 6 (1763), reprinted in *Laws,
Statutes, Ordinances and Constitutions, Ordained, Made
and Established, by the Mayor, Aldermen, and
Commonalty, of the City of New York, Convened in
Common-Council, for the Good Rule and Government of
the Inhabitants and Residents of the Said City* 11 ............................ 12

Ordinances of the City of Schenectady, XI (1824), reprinted
in *Laws of the State of New-York, Relating to the City of
Schenectady: And the Laws and Ordinances of the
Common Council of the City of Schenectady* 58 .................................. 12

Park Ordinances, Springfield, Mass. (1891) .......................................... 15

iv

**TABLE OF AUTHORITIES (cont'd)**

**Page(s)**

Pennsylvania – General Assembly, Omitted Laws, No. 1020,
*A Supplement to An Act appropriating ground for public
purposes in the city of Philadelphia*, § 21.II (1867) ........................... 15

Proceedings of the Conventions of the Province of Maryland,
Held at the City of Annapolis in 1774, 1775, & 1776 ....................... 12

Rev. Ordinances of the City of Canton, Ill. 240 (1895) .......................... 15

Rev. Ordinances of the City of Boulder, CO, 157 (1899) ....................... 15

Rev. Ordinances of the City of Danville 83 (1883) ................................. 15

Rev. Ordinances of Salt Lake City, UT 248, ch. 27 § 6 (1888) .............. 15

Rules & Regs. of the Public Parks & Grounds of the City of
Saint Paul (1888) ................................................................................ 15

Tower Grove Park of the City of St. Louis 117 (1883) ........................... 15

Va. Code Ann. § 18.2-308.09(13) ............................................................ 22

**Other Authorities**

Alexis de Tocqueville, *Democracy in America, Volumes One
and Two*, ch. V.I. (trans. Henry Reeve, 1835),
https://perma.cc/ER9K-VVLG ...................................................... 9, 10

Anthony O'Rourke et al*: Disbanding Police Agencies*, 121
Colum. L. Rev. 1327 (2021) .............................................................. 11

Antonin Scalia*, Originalism: The Lesser Evil*, 57 U. Cin. L.
Rev. 849 (1989) ................................................................................. 8, 9

*About the Zoo: An American First*, Philadelphia Zoo Website,
https://perma.cc/J95E-DMSW ........................................................... 15

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Delaware Superior Court, *Concealed Deadly Weapons Permits Application Page,* https://perma.cc/C3KZ-UPCE ................. 25

Elizabeth Blackmar and Roy Rosenzweig, *Central Park History* (except from Kenneth T. Jackson, *The Encyclopedia of New York City* (Yale University Press, 1995), https://perma.cc/R8UZ-29MK ................................... 15

Frank Vram Zerunyan*, Home Rule In An Era Of Municipal Innovation: Article: The Evolution Of The Municipal Corporation And The Innovations Of Local Governance In California To Preserve Home Rule And Local Control*, 44 Fordham Urb. L.J. 217 (2019) ................................ 9

John F. Hart, *Colonial Land Use Law and Its Significance for Modern Takings Doctrine*, 109 Harv. L. Rev. 1252 (1996) ................................................... 11

Joseph Blocher & Darrell A.H. Miller, *The Positive Second Amendment, Rights, Regulation, and the Future of Heller* (2018) ................................................... 12

Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82, 115 (2013) ................................................... 12

Krass, Mark, *Debunking The Nondelegation Doctrine For State Regulation Of Federal Elections*, 108 Va. L. Rev. 1091 (2022) ................................................ 10, 13

Letter from Thomas Jefferson to Joseph C. Cabell, Esq. (Feb. 2, 1816), https://perma.cc/7RPW-AQNV ............................. 9

Louisiana Department of Public Safety and Corrections, *Louisiana Concealed Handgun Permit Application Packet*, https://perma.cc/GBM6-5VST .................................... 25

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Mike Rapport, *The Unruly City: Paris, London, and New York in the Age of Revolutions* (Hachette Book Group, 2017) ................................................................................. 13

Minutes of Proceedings of the Bd. of Comm'rs of the Central Park 166 (1858), https://perma.cc/DFX2-RCCV ................................. 15

National League of Cities, *Principles Of Home Rule For The 21st Century*, 100 N.C.L. Rev. 1329 (2022) ........................................ 13

Nestor M. Davidson, *Local Constitutions*, 99 Tex. L. Rev. 839 (2021) ................................................................................. 13

Paul Revere, *The Bloody Massacre perpetrated in King Street Boston on March 5th 1770 by a party of the 29th Regt.* (Boston, 1770) ........................................................................ 13

Pistols—Carrying Of: Ordinance to Regulate the Carrying of Pistols, Oct. 25, 1880, reprinted in The Brooklyn Daily Eagle, Oct. 26, 1880, at 1 (Brooklyn, N.Y.) ........................................ 23

Serena Zabin, *The Boston Massacre: A Family History* (Houghton Mifflin Harcourt, 2020) ..................................................... 13

State of Rhode Island, *Pistol Permits Application Page*, https://perma.cc/2GEA-276B ................................................. 25

## INTEREST OF AMICUS CURIAE
## AND SUMMARY OF ARGUMENT[1]

The City of New York submits this brief as amicus curiae in support of the State of New York in its appeal from the preliminary injunction issued by the U.S. District Court for the Northern District of New York (Suddaby, J.), which blocked enforcement of multiple provisions of the Concealed Carry Improvement Act (CCIA), L. 2022, ch. 371, §§ 1, 23, including certain of its "sensitive place" restrictions and its licensure requirements. While the City supports the full sweep of the State's arguments for reversal, we write here to highlight two of the district court's many methodological errors that are of particular concern.

On these two points—and more broadly—the City has an acute interest in the proper development of Second Amendment jurisprudence. The Court's decision in this appeal will not only address the constitutional status of critical provisions of the CCIA, but will also be among the first appellate decisions to construe *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), and thus may resolve

---

[1] The City certifies that no party's counsel authored the brief in whole or in part, or contributed money that was intended to fund preparing or submitting the brief, that and no other person contributed money intended to fund preparing or submitting the brief. Fed. R. App. P. 29(a)(4)(E). All parties consented to the filing of this brief.

important methodological questions that will guide future cases. It is crucial that *Bruen* be correctly applied to preserve state and local authority to designate sensitive places and to set effective licensure standards and procedures.

The City's interests reflect its primary role in protecting public safety within its borders since the Founding era. It has long regulated firearms in particularly crowded areas where the risks of their misuse are most acute and has accrued over a century of experience administering the State's firearms-licensing scheme, including through careful investigation of applicants to ensure that firearms are possessed within its jurisdiction only by law-abiding, responsible citizens.

In furtherance of these interests, the City offers the following specific points for the Court's consideration. *First*, the district court improperly discounted local regulations of firearms in its analysis of the historical tradition of firearms regulation. Localities were responsible for much of the regulation of firearms from the Founding era through the Reconstruction period (and beyond), so to disregard local laws is to ignore evidence that is powerfully probative of relevant traditions concerning where firearms could be possessed and who could possess them. The local

laws identified in the State's brief provide strong confirmation that the Second Amendment tolerates appropriate limitations of firearm possession in certain sensitive locations identical or closely analogous to those defined in the CCIA, as well as standards restricting firearm access to law-abiding, responsible citizens, as are contained in the CCIA.

*Second*, the district court erred in enjoining, for supposed lack of historical analogues, the CCIA's "good moral character" licensure standard and several of the disclosures required to permit assessment of license applications under that standard. To be sure, the State has provided ample historical support for these licensure provisions, but it need not have. The historical pedigree of laws restricting firearms to law-abiding, responsible citizens is beyond doubt, because the Supreme Court has already determined that only such persons fall within the scope of original public understanding of the Second Amendment right to begin with. The CCIA's licensing standard, which requires an applicant to have the "essential temperament" to possess and carry a firearm safely, is squarely in line with "shall-issue" licensure standards that the Supreme Court said in *Bruen* appropriately ensure that only such citizens are authorized to carry firearms.

3

Even more clearly, the district court erred in requiring the State to marshal particularized historical analogues for the applicant-disclosure requirements in the CCIA that are designed to allow the licensing official to assess whether an applicant meets the "essential temperament" standard. Those disclosure requirements are simply intermediate steps toward a licensing determination; they have no Second Amendment valence in themselves. Either the applicant will receive a license, in which case there will be no Second Amendment injury, or the application will be denied, in which case the correct question will be whether the denial was a proper and lawful one.

To be sure, *Bruen* suggests there may be an exception to these principles where a licensing step is so burdensome in practice that it operates to unduly restrict the right of law-abiding, responsible citizens to keep and bear arms. But plaintiffs have made no such showing here, and they could not reasonably attempt it, where they sued before the law even became effective and before the law's licensing provisions were ever applied to them. On plaintiffs' facial challenge, the district court's requirement of historical analogues as a prerequisite to sustaining the disclosure requirements is neither sensible nor faithful to *Bruen*.

4

## ARGUMENT

## POINT I

## THE DISTRICT COURT FAILED TO GIVE WEIGHT TO LOCAL LAWS WHEN SEARCHING FOR A TRADITION OF FIREARM REGULATION

In *Bruen*, the Supreme Court held that the validity of a contemporary firearm regulation that burdens conduct falling within the plain text of the Second Amendment depends on the existence of "historical precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation." 142 S. Ct. at 2131-32 (quotation marks omitted). During the Founding era and continuing well after, firearm regulation was in significant degree a local matter. The district court employed a flawed approach to discerning the existence of a historical tradition of firearm regulation when it discounted—wholesale—evidence of local-level regulations of firearm possession (Special Appendix ("SPA") 15, 105 n.81, 137).

**A.** The district court disregarded local laws based on a misreading of *Bruen*'s taxonomy of historical sources (SPA15, 105 n.81). In *Bruen*, the State had relied on, among other things, laws from several western territories as evidence that the "proper-cause" licensing requirement had

a historical basis. The Court concluded that "the bare existence of these localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry," reasoning that the western territories were short-lived, their laws were largely untested in the courts, and they were barely populated. *Bruen*, 142 S. Ct. at 2154.

The district court mistakenly extended *Bruen*'s discussion of the laws of "localized" western territories to *all* local regulations, reasoning that because local laws applied to only a fraction of the population, they needed to be "accompanied by similar laws from states" to serve as evidence of the original meaning of the Second Amendment (SPA105 n. 81, 137). But *Bruen* did not limit lower courts to reviewing only *state* laws when seeking to discern the original public understanding of the right. Extending *Bruen*'s dismissive treatment of the laws of the western territories—largely unpopulated areas lacking many formal governmental structures—to local laws from well-established and

6

leading cities in the early American Republic was a methodological error that this court should correct.[2]

Beyond its lack of support in *Bruen*, the lower court's approach is inconsistent with the Supreme Court's broader practice of originalist analysis. The Court has long relied on various sources, such as historical accounts, dictionaries, and legal commentaries, when seeking to glean the historical understanding of the Second Amendment. *See, e.g.*, *McDonald v. City of Chicago*, 561 U.S. 742, 813-35 (2010) (Thomas, J., concurring) (considering general historical context, Blackstone's Commentaries, the Report of the Joint Committee on Reconstruction, and "well-circulated" statements and speeches made by members of Congress leading up to, and during, the debates on the Fourteenth Amendment); *Heller*, 554 U.S. at 583-86, 592-600 (describing historical context and relying on historical legal scholars including Blackstone to discern original meaning). As Justice Scalia explained, the search for

---

[2] The Court also observed that "a law in effect in a single State, or a single city" would be insufficient to overcome the "overwhelming weight of other evidence" that public carry was historically available without regard to special need. *Bruen*, 142 S. Ct. at 2154 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 632 (2008)). But that does not mean such a law should receive no weight in identifying the relevant historical tradition.

original public meaning, "[p]roperly done, … requires the consideration of an enormous mass of material—in the case of the Constitution and its Amendments, for example, to mention only one element, the records of the ratifying debates in all the states," and "immersing oneself in the political and intellectual atmosphere of the time."[3] The district court, however, effectively put an entire category of highly pertinent evidence out of bounds.

**B**. Failing to heed the Supreme Court's teachings, the district court engaged in an ahistorical inquiry that missed the tradition favoring local self-government that formed the backdrop for firearm regulation in the Founding era. The court overlooked that local officials played the primary role in the day-to-day lives of their residents in that period (as they largely do still today), and thus created most rules for governing conduct

---

[3] Antonin Scalia*, Originalism: The Lesser Evil*, 57 U. Cin. L. Rev. 849, 856-57 (1989).

and maintaining law and order.[4] Localism was, in Justice Scalia's phrase, a key part of "the political and intellectual atmosphere of the time."[5]

Local governments historically had the primary responsibility for matters of local concern because "[t]he principle of 'Home Rule' was an axiom among the authors of the Constitution." *Bute v. Illinois*, 333 U.S. 640, 652 (1948); *see Avery v. Midland Cty.*, 390 U.S. 474, 481 (1968) ("[I]nstitutions of local government have always been a major aspect of our system …."). Thus, Tocqueville observed that "[m]unicipal independence is … a natural consequence of the principle of the sovereignty of the people in the United States," and noted that "amongst the inhabitants of New England I believe that not a man is to be found

---

[4] So, for example, Jefferson opined that "the way to have good and safe government, is not to trust it all to one; but to divide it among the many, distributing to every one exactly the functions he is competent to." Letter from Thomas Jefferson to Joseph C. Cabell, Esq. (Feb. 2, 1816), https://perma.cc/7RPW-AQNV; Frank Vram Zerunyan, *Home Rule In An Era Of Municipal Innovation: Article: The Evolution Of The Municipal Corporation And The Innovations Of Local Governance In California To Preserve Home Rule And Local Control*, 44 Fordham Urb. L.J. 217, 218-19 (2019) ("The concept of decentralized governance finds its roots in the Articles of Confederation, which, of course, predates the U.S. Constitution and the Bill of Rights," and in the writings of the key political philosophers of the time, including "Montesquieu, Voltaire, John Locke, and Thomas Paine … against authoritarian government and for representative government.").

[5] Scalia, *supra* n.3, at 856-57.

9

who would acknowledge that the State has any right to interfere in their local interests."[6]

The early primacy of local authority may now seem strange. "Contemporary American law holds that local officials are[,] in every essential sense, only auxiliaries of the State," but "this conception of local power is anachronistic as applied to the Founding era."[7] At the country's founding, "local governments routinely invoked a kind of natural law right, supported by customary practice, to govern their own communities" and impose "both criminal and civil regulation."[8] Local institutions "exercis[ed] power on behalf of their constituents—a sort of

---

[6] Alexis de Tocqueville, *Democracy in America, Volumes One and Two*, ch. V.I. (trans. Henry Reeve, 1835), https://perma.cc/ER9K-VVLG. In describing New England's townships after the Founding, de Tocqueville explained that they "remained as they were before; and although they are now subject to the State, they were at first scarcely dependent upon it. It is important to remember that they have not been invested with privileges, but that they have, on the contrary, forfeited a portion of their independence to the State. The townships … are independent in all that concerns themselves." *Id.*

[7] Krass, Mark, *Debunking The Nondelegation Doctrine For State Regulation Of Federal Elections*, 108 Va. L. Rev. 1091, 1131 (2022) (quotation marks omitted).

[8] *Id.* (quotation marks omitted). "The rights preserved [in the Constitution] are ancient rights, and the municipal bodies recognized in it, and required to be perpetuated, were already existing, with known elements and functions." *People ex rel. Leroy v. Hurlbut*, 24 Mich. 44, 87 (Mich. 1871) (Cooley, J., concurring).

competing form of quasi-sovereignty that rivaled the supremacy of state governments."[9]

**C.** Consistent with this view of local authority, during the Founding era local governments broadly regulated for public safety. Municipal police forces and local constables were charged with maintaining public safety.[10] Municipal ordinances governed land use.[11] In predecessors to modern sensitive-place restrictions, local laws aimed to prevent public nuisances and fires and to protect bystanders by specifying where gunpowder could be stored[12] and how it could be transported,[13] and where

---

[9] *Id.*

[10] *See* Anthony O'Rourke et al*: Disbanding Police Agencies*, 121 Colum. L. Rev. 1327, 1366 (2021) (discussing conflicts across the country over control of municipal police forces between local and state governments beginning in the mid-nineteenth century "when cities lost their legal independence").

[11] *E.g.*, John F. Hart, *Colonial Land Use Law and Its Significance for Modern Takings Doctrine*, 109 Harv. L. Rev. 1252 (1996) (discussing extensive Founding-era local land-use and public-nuisance regulations).

[12] N.Y. City, N.Y. (1763), A Law for the Better Securing of the City of New York from the Danger of Gun Powder (see *supra* at iv for reprint information) (restricting amount of gunpowder that could be stored within two miles of City Hall); 1784 N.Y. Laws 627, An Act to Prevent the Danger Arising from the Pernicious Practice of Lodging Gun Powder in Dwelling Houses, Stores, or Other Places within Certain Parts of the City of New York, or on Board of Vessels within the Harbour Thereof, ch. 28 (prohibiting storage of gunpowder within a mile of City Hall).

[13] "New York City required ships to unload gunpowder at a magazine within twenty-four hours of arrival in the harbor and before the ship 'hawled along side of any wharf, pier or key within the city,'" while "Boston subjected any 'Gun Powder … kept on

*(cont'd on next page)*

firearms could be carried[14] and discharged.[15] The discharge laws, in particular—including New York City's law dating to 1763—recognized the acute danger to bystanders posed by firearms in crowded public spaces. And, as the State has explained (Brief for Appellants Nigrelli and Doran ("App. Br.") 34), modern licensure standards find precedent in laws going back to the Founding era, such as in local militia-mustering laws that disarmed anyone appearing unfit to safely possess firearms.

These local laws should serve as a key source for discerning the original public meaning of the Second Amendment. And the laws of large

---

board any ship or other vessel laying to, or grounded at any wharf within the port of Boston' to confiscation.'" Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82, 115 (2013) (citing Act of June 19, 1801, ch. XX, 1801 Mass. Acts 507; Act of Apr. 13, 1784, ch. 28, 1784 N.Y. Laws 628).

[14] Joseph Blocher & Darrell A.H. Miller, *The Positive Second Amendment, Rights, Regulation, and the Future of Heller*, 20 (2018) (discussing local "affray" regulations in Massachusetts, North Carolina, and Virginia, during the colonial and Founding era modelled on the Statute of Northampton, which prohibited carrying firearms in fairs and markets); *see also* Blocher, *supra* n.13, at 113.

[15] Ordinances of the City of N.Y., § 6 (1763) (see *supra* at iv for reprint information) (prohibiting discharging a firearm in a street, orchard, garden, or enclosure, or in any place "where persons frequent to walk"); A Law to Prevent the Firing of Guns in the City of N.Y., ch. XXIII, § 1 (1803) (prohibiting discharge within four miles of City Hall to prevent "accidents and other dangerous consequences"); Ordinances of the City of Schenectady, XI (1824) (see *supra* at iv for reprint information) (prohibiting discharge of firearms "in any street, lane or alley, or in any yard, garden or other enclosure, or in any place which persons frequent to walk …."); *see also* Proceedings of the Conventions of the Province of Maryland, Held at the City of Annapolis in 1774, 1775, & 1776 (prohibiting the carrying of firearms in election locations).

cities like New York, Philadelphia, and Boston should receive particular

weight because of the pivotal role that these cities played in the

Revolution and in the forging the nation's political ideals.[16] By ignoring

local measures, the district court created an ahistorical rule that blinded

it to a rich body of evidence. Local laws regulating firearms, which would

have loomed large at the Founding and thereafter, are direct antecedents

to restrictions in the CCIA.

**D.** To be sure, by the mid-nineteenth century, the primacy of local

self-government had become somewhat overshadowed by notions of

centralized state sovereignty.[17] By then, Iowa Judge John Dillon's view

---

[16] Cities were places of revolt against British rule—from the Boston Massacre to Patrick Henry's leading of the local militia march on Williamsburg, Virginia to reclaim gunpowder seized by the British. They were also places of acute civic engagement where America's political imagination was born. Mike Rapport, *The Unruly City: Paris, London, and New York in the Age of Revolutions* (Hachette Book Group, 2017); Serena Zabin, *The Boston Massacre: A Family History*, 14-24, 198-230 (Houghton Mifflin Harcourt, 2020); *see also* Paul Revere, *The Bloody Massacre perpetrated in King Street Boston on March 5th 1770 by a party of the 29th Regt.* (Boston, 1770), Engraving, Library of Congress.

[17] Krass, *supra* n.7, at 1132; *see also* Nestor M. Davidson, *Local Constitutions*, 99 Tex. L. Rev. 839, 851 (2021) (noting that "formal subordination [of local governments] ripened in the nineteenth century to become the prevailing view of local legal identity, known as Dillon's Rule"); National League of Cities, *Principles Of Home Rule For The 21st Century*, 100 N.C.L. Rev. 1329, 1332-33 (2022) (concluding that "because federal constitutional silence left the balance between state and local legal authority to be determined within the states, states throughout the nineteenth century sought to [and eventually did] assert control over local governance.").

of local governments as subordinate authorities that derive their power from the States—known as Dillon's Rule—had won out over Michigan Judge Thomas Cooley's competing view of an inherent right of local self-government independent of state control.[18] But even after Dillon's Rule came to prevail, local institutions continued to play a key role in regulating the possession of firearms in public and limiting access to firearms to law-abiding, responsible residents.

The district court improperly failed to credit the local laws enacted during this period that support the CCIA's sensitive-place restrictions. For instance, around Reconstruction, when new public spaces were created—such as municipal public parks and zoos—it was local officials who determined whether firearms would be permitted. Central Park, the first landscaped public park in the United States, opened to the public in

---

[18] *Compare Hurlbut*, 24 Mich. at 66-67 (1871) (Cooley, J., concurring) (concluding that it was not "the intention of the convention in framing, or the people in adopting, the constitution … to deprive cities and villages of … local self-government enjoyed by other political divisions of the state"), *with Clinton v. Cedar Rapids & M. R. R. Co.*, 24 Iowa 455, 475 (1868) (Dillon, J.) ("Municipal corporations owe their origin to, and derive their powers and rights wholly from, the legislature."), and *People v. Kerr*, 27 N.Y. 188, 197 (1863) (describing the City of New York as a "municipal corporation, a public body exercising, within its sphere, a portion of the sovereignty of the State").

14

1859.[19] America's first zoo opened in Philadelphia in 1874.[20] The carrying of firearms was immediately prohibited in these new settings by both cities.[21] And many other local prohibitions of firearms in public parks were enacted during this period.[22] These Reconstruction-era local laws

---

[19] Elizabeth Blackmar and Roy Rosenzweig, *Central Park History* (except from Kenneth T. Jackson, *The Encyclopedia of New York City* (Yale University Press, 1995), https://perma.cc/R8UZ-29MK.

[20] The Philadelphia Zoo, located in Fairmount Park, was commissioned in 1859, but not opened until 1874 due to delays caused by the Civil War. *About the Zoo: An American First*, Philadelphia Zoo Website, https://perma.cc/J95E-DMSW.

[21] *See* Minutes of Proceedings of the Bd. of Comm'rs of the Central Park 166 (1858), https://perma.cc/DFX2-RCCV; Pennsylvania – General Assembly, Omitted Laws, No. 1020, A Supplement to An Act appropriating ground for public purposes in the city of Philadelphia, § 21.II (1867) (establishing Fairmount Park and prohibiting firearms in the park).

[22] *Id.*; *see also* Laws & Ordinances Governing the Vill. of Hyde Park 310 (1876) (enacted 1875); Mun. Code of Chicago, 391, § 1690 (1881); Tower Grove Park of the City of St. Louis 117 (1883); Rev. Ordinances of the City of Danville 83 (1883); Rev. Ordinances of Salt Lake City 248, ch. 27 § 6 (1888); Rules & Regs. of the Public Parks & Grounds of the City of Saint Paul (1888); City of Trenton, N.J., Charter & Ordinances 390 (1903) (enacted 1890); Park Ordinances, Springfield, Mass. (1891); 3rd Ann. Rep. of the Park Comm'rs of the City of Lynn 23 (1891); Laws & Ordinances for the Gov't of the Mun. Corp. of the City of Williamsport, Pa. 141 (1891); Compiled Ordinances of the City of Grand Rapids 163, § 432 (1907) (enacted 1891, amended 1892 & 1897); Mun. Code of the City of Spokane, Wash. 123 (1903) (enacted 1892); Laws & Ordinances of the City of Peoria, Illinois 667 (1892); Charter of the City of Wilmington, Rules and Regulations of the Board of Park Commissioners, Part VII, § 7 (1893); Digest of the Acts of Assembly Relating to & the Gen. Ordinances of the City of Pittsburgh 496 (1897) (enacted 1893); 1895 Mich. Pub. Acts 596; Rev. Ordinances of the City of Canton, Ill. 240 (1895); Gen. Ordinances of the City of Indianapolis 648, § 1971 (1904) (enacted 1896); Digest of the Laws & Ordinances for the Gov't of the Mun. Corp. of the City of Reading, PA 240 (1897); Rev. Ordinances of the City of Boulder, CO 157 (1899).

serve as compelling proof that sensitive-place restrictions are consistent with the contemporaneous understanding of the Second Amendment.

The district court also improperly discounted local laws supporting the CCIA's "essential temperament" licensing standard. As explained below (*see* Point II.A, *supra*), there is no need to engage in a further historical inquiry to confirm that a government acts consistently with the Second Amendment when limiting access to firearms to law-abiding, responsible citizens, as *Heller* already canvassed the relevant history and put the question beyond doubt. Nonetheless, if such an inquiry were appropriate, the CCIA's licensing standard would easily pass it.

As the State has shown (App. Br. 35-37), there was a robust tradition of local firearm licensing during Reconstruction that illustrates the key role of local licensing officials and the value of local law in discerning the public understanding of the scope of the right. For example, New York City began interviewing applicants for firearm licenses as early as 1878, as did Brooklyn, Buffalo, Syracuse, Elmira, Albany, and Lockport (App. Br. 35). And Brooklyn's 1880 ordinance prohibited the carrying of firearms except for self-defense and with a permit, which would be issued by the "officer in command of the station

house of the [local police] precinct," if "the applicant is a proper and law abiding person."[23]

Historical municipal firearms ordinances plainly reflect the public's understanding of permissible limitations on the public carrying of firearms at the relevant times. Looking to local law makes particular sense—indeed, is essential—when considering public spaces of a nature that historically existed only in cities, such as crowded harbors or municipal public parks and zoos, and that were primarily regulated by those local governments. Avoiding consideration of local laws ignores the key source of regulation of these spaces since their inception. The district court's decision to ignore those rules in discerning the original public understanding was error.

---

[23] Pistols—Carrying Of: Ordinance to Regulate the Carrying of Pistols, Oct. 25, 1880, reprinted in The Brooklyn Daily Eagle, Oct. 26, 1880, at 1 (Brooklyn, N.Y.).

## POINT II

## THE DISTRICT COURT ERRED BY REQUIRING HISTORICAL ANALOGUES FOR THE ESSENTIAL-TEMPERAMENT STANDARD AND RELATED DISCLOSURE REQUIREMENTS

The district court also made a significant methodological error in its assessment of the CCIA's "essential temperament" licensing standard and the various information disclosures the CCIA requires in connection with a license application (SPA90-123).[24] *Bruen* makes clear that a licensure standard like the CCIA's is consistent with the Second Amendment. And the required disclosures—of four character references, a list of family members and other cohabitants, three years of social-media handles, and other relevant information sought by the licensing official—as well as the requirement to appear for an in-person interview, Penal Law § 400.00(1)(o)(i), (ii), (iv), (v), all facilitate a licensing official's assessment of whether the applicant meets the statutory standard. Contrary to the district court's reasoning, the "essential temperament"

---

[24] As the State has compellingly shown (App. Br. 28-48), if a historical analysis were required here, each of the disclosure requirements would easily pass muster under it. But the court made an even more fundamental error by engaging in historical inquiry at all as to these requirements.

18

licensing standard, and the disclosures reasonably designed to reveal whether an applicant meets it, need not be tested for specific historical analogues to survive Second Amendment scrutiny.

**A.** As the State explains (App. Br. 29-39), the CCIA's definition of good moral character—"having the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others," N.Y. Penal Law § 400.00(1)(b)—comports with a fundamental limitation inherent in the Second Amendment right itself. Having surveyed the historical evidence of firearm regulation, the Supreme Court concluded in *Heller* that the right protected by the Second Amendment belongs to "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635. The CCIA's "essential temperament" standard limits access to firearms to these law-abiding, responsible citizens.

*Bruen* confirms that laws limiting the issuance of firearm licenses to law-abiding, responsible applicants have a sound historical pedigree. 142 S. Ct. at 2126; *see also id.* at 2121 (Kavanaugh, J., concurring) ("[T]he Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense."). Thus, for

19

example, *Bruen* cited with approval a historical restriction, "consistent with a right of the public to peaceably carry handguns for self-defense," that provided that the "constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed," while "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." *Bruen*, 142 S. Ct. at 2152 (quoting Cong. Globe, 39th Cong., 1st Sess., at 908-909). ). The Court's opinion in *Bruen* repeatedly describes the Second Amendment right as limited to "law-abiding, responsible citizens." *Id*. at 2131, 2138 n.9, 2156.

Indeed, *Bruen* made clear that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes … which often require applicants to undergo a background check or pass a firearms safety course … to ensure … that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id*. at 2138 n.9. The Court emphasized that this family of shall-issue regimes are permissible because they set narrow, objective, and definite criteria. *Id*. When making this pronouncement, the Court did not subject these regimes individually to historical scrutiny,

apparently reflecting that the historical inquiry had already been undertaken and resolved in *Heller*.

In the course of its discussion of these shall-issue regimes, *Bruen* approved licensure requirements much like the CCIA's requirement that applicants possess "the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others." Among the shall-issue regimes that the Supreme Court approved are three—Connecticut, Delaware, and Rhode Island—that the Court observed "have discretionary criteria but appear to operate like 'shall issue' jurisdictions." *Bruen*, 142 S. Ct. at 2123 n.1 (citing Conn. Gen. Stat. §29-28(b) (2021); Del. Code, Tit. 11, § 1441 (2022); R.I. Gen. Laws § 11-47-11 (2002)).

The Court explained that "[a]lthough Connecticut officials have discretion to deny a concealed-carry permit to anyone who is not a 'suitable person,' *see* Conn. Gen. Stat. § 29-28(b), the 'suitable person' standard precludes permits only to those 'individuals whose conduct has shown them to be lacking the essential character of [sic] temperament necessary to be entrusted with a weapon.'" *Id.* (quoting *Dwyer* v. *Farrell*,

21

193 Conn. 7, 12, 475 A. 2d 257, 260 (1984)). This is a nearly identical to the standard adopted by New York in the CCIA.

In addition, Delaware has a "good moral character" standard that requires applicants to show a good reputation for "peace and good order in the community." Del. Code, Tit. 11, § 1441 (2022). And Rhode Island requires that the applicant demonstrate "suitability," which "involves an exercise of discretion," but holds that "certain individuals are unsuitable as a matter of law, including convicted felons, habitual drunkards, mental incompetents, illegal aliens, and anyone who has failed to meet the minimum firing qualification score." *Mosby v. Devine*, 851 A.2d 1031, 1048 (R.I. 2004).

Other jurisdictions' licensing schemes that were cited approvingly in *Bruen* also provide that individuals who are not responsible to possess firearms can be disqualified from receiving licenses. *See* Va. Code Ann. § 18.2-308.09(13) (disqualifying "[a]n individual who the court finds, by a preponderance of the evidence, based on specific acts by the applicant, is likely to use a weapon unlawfully or negligently to endanger others"); Colo. Rev. Stat. § 18-12-203(2) (permitting denial of a firearm license if, among other things, "the sheriff has a reasonable belief that documented

22

previous behavior by the applicant makes it likely the applicant will present a danger to self or others if the applicant receives a permit to carry a concealed handgun").

The district court disregarded *Bruen*'s discussion of this family of licensing regimes when it demanded that the State justify the "essential temperament" licensing standard with fresh analysis of additional historical sources. The lawfulness of licensing schemes that authorize officials to restrict access to firearms by people lacking the essential temperament to responsibly possess them is not up for debate following *Bruen*.

**B.** Because the CCIA's "essential temperament" standard is presumptively lawful after *Bruen*, without the need for further historical inquiry, the district court's mistaken choice to undertake a historical analysis of the CCIA's disclosure requirements for license applicants— which are necessary to implement the scheme—is particularly anomalous. *Bruen* teaches that jurisdictions may administer a variety of "shall issue" licensing schemes, and it did not scrutinize the various ways in which they implement those schemes for consistency with a historical tradition. It would be passing strange to subject the disclosure

23

requirements used to gauge character, temperament, and judgment (requiring character references, disclosing aliases or social-media handles, etc.) to particularized historical scrutiny when the licensing standard itself is not subject to such analysis.

More pointedly, perhaps, because the CCIA's "essential temperament" standard is constitutional, the information that a licensing official seeks in order to assess an applicant's compliance with the standard should not implicate the Second Amendment at all, so long as the information is reasonably calculated to aid in the necessary assessment. Licensing officials use such information to test whether an applicant is a "law-abiding, responsible citizen" who possesses a right to keep and bear arms, *Heller*, 554 U. S. at 635, and doing so does not interfere with the right's exercise by law-abiding, responsible citizens.

Indeed, when the Court in *Bruen* approved the various shall-issue licensing schemes, it implicitly approved the assortment of dissimilar ways in which different jurisdictions conduct their application processes. Thus, for instance, nothing in *Bruen*'s discussion of shall-issue regimes casts doubt on Louisiana's scheme, under which applicants must provide copies of all divorce decrees, disclose all aliases they've ever used, and

24

sign an "Authorization to Release Health Information" to the licensing division.[25] Nor does *Bruen* suggest that Louisiana would need to point to a historical antecedent for its request that applicants disclose to the licensing official if they are "currently taking, or have … ever been prescribed any medication used for the treatment of depression, psychosis or any mental illness."[26] Delaware likewise may continue to require an applicant for a concealed-carry permit to include with the application a reference questionnaire signed by five "respectable citizens of the county in which the applicant resides" stating that the applicant is of good moral character, has a good reputation for "peace and good order in the community," and will carry for purposes of self-defense.[27] And Rhode Island may require applicants to disclose all nicknames and aliases to the licensing officer.[28] Just like social-media handles, an alias or a prescription for Prozac is not a disqualifier, but a proper launching-

---

[25] Louisiana Department of Public Safety and Corrections, *Louisiana Concealed Handgun Permit Application Packet*, https://perma.cc/GBM6-5VST.

[26] *Id.*

[27] Delaware Superior Court, *Concealed Deadly Weapons Permits Application Page*, https://perma.cc/C3KZ-UPCE.

[28] State of Rhode Island, *Pistol Permits Application Page*, https://perma.cc/2GEA-276B.

off point for an investigation into whether an applicant is a law-abiding, responsible citizen.

The Supreme Court's endorsement of all of these varying schemes reflects that the intermediate steps in licensure ordinarily should not trigger Second Amendment scrutiny. If an applicant succeeds in obtaining a license, they usually will have suffered no Second Amendment injury by virtue of the disclosures made in the licensing process. If the applicant is denied a license, the pertinent question will be whether the denial was lawful and appropriate—meaning whether the licensing official had a sound basis for concluding that the individual was not a law-abiding, responsible citizen under the controlling and constitutionally valid statutory standard. In either circumstance, the disclosures required as a step in the licensing process, where reasonably calculated to assist the licensing determination, will not typically implicate the Second Amendment.

C. *Bruen* itself provides a guardrail for determining when steps in licensure might raise Second Amendment concerns, as applied, cautioning that "[b]ecause any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue

regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry."[29] *Bruen*, 142 S. Ct. at 2138 n.9. This suggests that steps in licensure might invite Second Amendment scrutiny if they operate, in practice, to deny the rights of law-abiding, responsible citizens to keep and bear arms.

But plaintiffs have never claimed that the CCIA has been put to "abusive ends." Nor could they reasonably attempt such a showing, where they sued before the law went into effect and where its licensing provisions remain today in their infancy. On plaintiffs' facial challenge, the district court erred in reading *Bruen* to require a jurisdiction with a shall-issue regime to justify each of the steps in its licensure process by reference to historical tradition. This Court should correct that error, as well as the others described in this brief and in the State's comprehensive submission.

---

[29] A second avenue for as-applied challenge may arise if a facially valid licensure process operated in practice to afford "open-ended discretion" over licensing determinations to licensing officials that interfered with law-abiding, responsible citizens' exercise of their Second Amendment rights. *See Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring). Plaintiffs have not made any such showing here—and could not reasonably undertake to do so on a facial challenge.

# CONCLUSION

This Court should vacate the preliminary injunction.

Dated:  New York, NY
        January 17, 2023

                                Respectfully submitted,

                                HON. SYLVIA O. HINDS-RADIX
                                *Corporation Counsel*
                                *of the City of New York*
                                Attorney for Amicus Curiae City of
                                New York

                        By: *Elina Druker*
                                ELINA DRUKER
                                Assistant Corporation Counsel

                                100 Church Street
                                New York, NY 10007
                                212-356-2609
                                edruker@law.nyc.gov

RICHARD DEARING
CLAUDE S. PLATTON
ELINA DRUKER
    *of Counsel*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word, and according to that software, it contains 5,916 words, not including the table of contents, table of authorities, this certificate, and the cover.

_____
ELINA DRUKER