# 22-2908(L)

## 22-2972 (Con)

### United States Court of Appeals
### For the Second Circuit

IVAN ANTONYUK, COREY JOHNSON, ALFRED TERRILLE, JOSEPH MANN,
LESLIE LEMAN, AND LAWRENCE SLOANE,

*Plaintiffs-Appellees*

v.

STEVEN P. NIGRELLI, IN HIS OFFICIAL CAPACITY AS ACTING-SUPERINTENDENT OF THE
NEW YORK STATE POLICE, MATTHEW J. DORAN, IN HIS OFFICIAL CAPACITY AS THE
LICENSING OFFICIAL OF ONONDAGA COUNTY, JOSEPH CECILE, IN HIS OFFICIAL CAPACITY
AS THE CHIEF OF POLICE OF SYRACUSE,

*Defendants-Appellants*

KATHLEEN HOCHUL, IN HER OFFICIAL CAPACITY AS THE GOVERNOR OF THE STATE OF
NEW YORK, WILLIAM FITZPATRICK, IN HIS OFFICIAL CAPACITY AS THE ONONDAGA
COUNTY DISTRICT ATTORNEY, EUGENE CONWAY, IN HIS OFFICIAL CAPACITY AS THE
SHERIFF OF ONONDAGA COUNTY, P. DAVID SOARES, IN HIS OFFICIAL CAPACITY AS THE
DISTRICT ATTORNEY OF OSWEGO COUNTY, DON HILTON, IN HIS OFFICIAL CAPACITY AS
THE SHERIFF OF OSWEGO COUNTY, JOSEPH STANZIONE, IN HIS OFFICIAL CAPACITY AS
THE DISTRICT ATTORNEY OF GREENE COUNTY,

*Defendants*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

### PLAINTIFFS-APPELLEES' ANSWERING BRIEF
### IN RESPONSE TO DEFENDANT-APPELLANT CECILE

Robert J. Olson
William J. Olson
William J. Olson, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
(703) 356-5070
wjo@mindspring.com

Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440
Stephen@sdslaw.us

# TABLE OF CONTENTS

TABLE OF AUTHORITIES........................................................................iii

ISSUE PRESENTED...............................................................................1

STATEMENT OF THE CASE....................................................................1

    Summary of the Challenged Statute.................................................1

    Procedural Background.......................................................................5

STANDARD OF REVIEW.........................................................................8

SUMMARY OF THE ARGUMENT............................................................9

ARGUMENT...........................................................................................12

I.     THE DISTRICT COURT PROPERLY FOUND STANDING....................13

II.    THE DISTRICT COURT PROPERLY FOUND JOHNSON WOULD
       SUFFER IRREPARABLE HARM................................................18

III.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS AGAINST
       DEFENDANT CECILE.............................................................20

IV.   THE DISTRICT COURT PROPERLY HELD THE BALANCE OF
       EQUITIES AND PUBLIC INTEREST FAVORED PLAINTIFFS............23

V.    THE HISTORICAL RECORD SUPPORTS PLAINTIFFS, NOT
       DEFENDANTS......................................................................26

CONCLUSION........................................................................................31

# TABLE OF AUTHORITIES

**Cases**

*A.H. v. French*, 985 F.3d 165 (2d Cir. 2021) ................................................................. 8

*Airbnb, Inc. v. City of N.Y.*, 373 F. Supp. 3d 467 (S.D.N.Y. 2019) ............................ 25

*Antonyuk v. Bruen* (*Antonyuk I*), 2022 U.S. Dist. LEXIS 157874 (N.D.N.Y. Aug. 31, 2022) ................................................................................................................................ 5

*Antonyuk v. Hochul*, 2022 U.S. Dist. LEXIS 182965 (N.D.N.Y. Oct. 6, 2022) ........... 5

*Antonyuk v. Nigrelli*, 2023 U.S. LEXIS 396 (Jan. 11, 2023) ....................................... 7

*Avitabile v. Beach*, 277 F. Supp. 3d 326 (N.D.N.Y. 2017) ......................................... 16

*Babbitt v. UFW Nat'l Union*, 442 U.S. 289 (1979) ................................... 14, 15, 16, 17

*Christian v. Nigrelli*, 2022 U.S. Dist. LEXIS 211652 (W.D.N.Y. Nov. 22, 2022) ...... 22

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................................................. 25

*Dzhabrailov v. Decker*, 2020 U.S. Dist. LEXIS 91892 (S.D.N.Y. May 26, 2020) ....... 25

*Elrod v. Burns*, 427 U.S. 347 (1976) ........................................................................... 15

*Lane v. United States*, 2020 U.S. Dist. LEXIS 54545 (N.D. Tex. Mar. 30, 2020) ...... 18

*League of Women Voters of the U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ............. 17

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .......................................................... 14

*Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558 (6th Cir. 1982) ...................... 25

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .............................................. 12, 24

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) ......................................... 14

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32 (2d Cir. 2018) .................................................................................................................................. 8

*N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013) ...................... 25, 26

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).......................*passim*

*Red Earth LLC v. United States*, 657 F.3d 138 (2d Cir. 2011).................................... 8

*Sajous v. Decker*, 2018 U.S. Dist. LEXIS 86921, 2018 WL 2357266 (S.D.N.Y. May 23, 2018) ............................................................................................................ 25

*Steffel v. Thompson*, 415 U.S. 452 (1974) ................................................................ 14

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).................................. 14

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ............................................ 8

*Yang, v. Kosinski*, 960 F.3d 119 (2d Cir. 2020)......................................................... 25

**Statutes**

2022 N.Y. Sess. Laws ch. 371 ...................................................................................... 1

N.Y. Penal Law § 265.01-d .......................................................................................... 3

N.Y. Penal Law § 265.01-e .......................................................................................... 3

N.Y. Penal Law § 400.00 .............................................................................................. 2

N.Y. Penal Law § 400.00(1)(b)..................................................................................... 2

**Other Authorities**

"Brigadier General John Peter Gabriel Muhlenberg," Yorktown Battlefield, National Park Service, https://bit.ly/3wZNSFn ..................................................... 30

1 <u>Records of the Governor and Company of the Massachusetts Bay in New England, 1628–1641</u>, 190 (Nathaniel B. Shurtleff ed., 1853), https://bit.ly/3XzOIEg .......... 28

19 <u>The Colonial Records of the State of Georgia, 1768–1773</u>, 138 (Allen D. Candler ed., 1911), https://bit.ly/3GXMXtz ......................................................................... 30

*6 Day Backpacking in the Adirondacks*, Cornell Outdoor Educ.,

   https://bit.ly/3Hktao3 ............................................................... 23

7 <u>The Statutes at Large of South Carolina</u>, 417 (David J. McCord ed., 1840),

   https://bit.ly/3R3aOg8 .............................................................. 30

A. Hagstrom, "*NY Gov. Hochul Defiant After Supreme Court Gun Decision: 'We're*

   *Just Getting Started,'*" Fox News (June 23, 2022), https://fxn.ws/3HPDiHu .......... 1

A. Hayes, "*Syracuse Homicides in 2022: The Lowest Number of Deaths in a Decade*,"

   Syracuse.com, https://bit.ly/3jffWkB .................................................. 13

Debunking the Myth of "Concealed-Carry Killers," available at

   https://herit.ag/3kQNaqZ ............................................................. 9

F. Dennis, <u>The Norfolk Village Green</u> (1917), https://bit.ly/3HITCcK ..................... 27

F.S. Stone, <u>Racine Belle City of the Lakes and Racine County Wisconsin</u> (1916),

   https://bit.ly/3wyv4N4 ................................................................ 29

https://www.boston.gov/parks/boston-common ............................................. 27

https://www.nps.gov/bost/learn/historyculture/fh.htm ...................................... 27

L. Kondratiuk, <u>A Guide to the Ancient and Honorable Artillery Company of</u>

   <u>Massachusetts,</u> https://bit.ly/3Y6uCkT .............................................. 27

M. Kramer & D. Brennan, "*Fresh off Primary Win, Gov. Kathy Hochul Dives Right*

   *into Guns – Who Can Get Them and Where They Can Take Them*," CBS N.Y.,

   https://cbsn.ws/3HoZLJM ............................................................. 4

<u>Narratives of Early Virginia, 1606–1625</u>, 273 (Lyon Gardiner Tyler ed., 1907),

   https://bit.ly/3XRQPTO ............................................................... 30

P. Godwin, <u>A Biography Of William Cullen Bryant, With Extracts From His Private Correspondence</u> (1883) ................................................. 29

<u>Reminiscences of a Retired Militia Officer</u>, The New-England Magazine Vol. 3 (1832), https://bit.ly/3kEqJoJ ..................................... 29

Smith, J., 2021 Homicide Rate in Syracuse Unchanged from 2020, WAER88.3, available at https://bit.ly/3kVQhxY ........................................ 9

<u>The Journal of The Rev. Francis Asbury, Bishop of The Methodist Episcopal Church, from August 7, 1771, to December 7, 1815</u> (1821), https://bit.ly/3DgPVrU ................................................................. 29

W. Sargent, <u>Letters of John Andrews, Esq., of Boston, 1772-1776</u>, Massachusetts Historical Society, https://bit.ly/3Y6uCkT ............................. 28

William Waller Henning, 1 <u>The Statutes at Large, Virginia 1619</u>, 127 (1823), https://bit.ly/3J92ZmP ............................................... 28

*Zoological Medicine*, CORNELL UNIV., https://bit.ly/3RdaM5n ................... 22

## ISSUE PRESENTED

1.  Did the district court abuse its discretion in granting Plaintiffs a preliminary injunction on multiple portions of the New York Concealed Carry Improvement Act?

## STATEMENT OF THE CASE

**Summary of the Challenged Statute**.  On June 23, 2022, the Supreme Court struck down the State of New York's requirement that a person demonstrate that "proper cause exists" as a condition of being granted a license to possess and carry a handgun.  *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2123 (2022) (hereinafter *Bruen*).  Perhaps even more importantly, the Court explained the appropriate analytical framework to be used in resolving future Second Amendment challenges.  *Id.* at 2156.  In so doing, the Court rejected the atextual "two-step" test widely adopted by most circuit courts, including this Court, instead establishing the requirement that any restriction on firearms freedom must be grounded in the text and "historical tradition" of the Second Amendment.  *Id.* at 2126.

Eight days later, the New York legislature and Governor Kathy Hochul fought back, enacting into law a poorly named and ineptly drafted statute entitled the "Concealed Carry Improvement Act" ("CCIA").  *See* 2022 N.Y. Sess. Laws ch. 371.  Rather than complying with the Supreme Court's decision, New York thumbed its nose at the Court – calling *Bruen* reprehensible, reckless, and politicized[1] – and created a new statutory scheme which made the concealed carry of firearms far more restrictive, and the licensing process far more onerous, than before *Bruen*.

---

[1] A. Hagstrom, *"NY Gov. Hochul Defiant After Supreme Court Gun Decision: 'We're Just Getting Started,'"* Fox News (June 23, 2022), https://fxn.ws/3HPDiHu.

Among its cornucopia of new restrictions, the CCIA replaces the repudiated requirement that an applicant for licensure demonstrate "proper cause" with the requirement that the applicant demonstrate, to the satisfaction of the State, "good moral character" – defined as "having the essential character, temperament and judgment necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others." N.Y. Penal Law § 400.00(1)(b); Special Appendix ("SA") 238.

Purportedly to help licensing officials determine whether an applicant has "good moral character," the CCIA demands that the applicant: (i) attend an in-person "interview" with the licensing official to discuss whatever topics the official deems relevant; (ii) provide a list of the names of and contact information for the applicant's spouse, *children*, and cohabitants; (iii) provide at least four "character references" who can attest to the applicant's "good moral character;" (iv) complete 16 hours of in-person training plus two hours of in-person "live fire" training, costing several hundreds of dollars; (v) provide information about the applicant's social media accounts for the past three years; and (vi) provide "such other information required by the licensing officer that is reasonably necessary and related to the review of the licensing application." N.Y. Penal Law § 400.00(1)(o)(i)-(v); SA239.

Next, taking the Supreme Court's warning not "to effectively declare the island of Manhattan a 'sensitive place'" as a challenge, the CCIA declares *virtually the entire landmass* of New York State off limits to the possession of firearms. First, the CCIA declares 20 broad categories (including scores of sub-categories) of places to be so-

2

called "sensitive locations" where firearm possession is entirely outlawed – including every medical office, church, public park, public conveyance, and entertainment venue within the state. N.Y. Penal Law § 265.01-e; SA244-45. The CCIA adds to this expansive list of prohibited places "any gathering of individuals to collectively express their constitutional rights" (*id.* at (s)), requiring that New Yorkers choose between exercising either First or Second Amendment rights.

There is no way to opt out of the CCIA's broad ban on firearms in "sensitive locations." For example, Plaintiff Joseph Mann *could not even keep a firearm in his own home for self-defense*, because his parsonage is part of the same building as the sanctuary of his Baptist Church. Similarly, Plaintiff Leslie Leman *could not even acquire a new firearm to keep at home*, because his small town in upstate New York is entirely surrounded by the rural Catskill Park – a place that the New York State Constitution declares to be "forever … wild," but which the CCIA classifies as yet another one of the innumerable places entirely off limits to firearms. *See* § 265.01-e(2)(d) ("parks" as a sensitive location); SA244.

As a final act of retribution against gun owners for having prevailed in *Bruen*, the CCIA declares *all private property* within New York to be a gun-free "restricted location" – entirely banning firearm possession unless each property owner affirmatively opts out by posting "clear and conspicuous signage" or otherwise provides "express consent" to the presence of firearms. N.Y. Penal Law § 265.01-d; SA243. Since most New York homeowners and proprietors cannot be expected to post qualifying signage, the CCIA functionally eliminates the carrying of firearms on

private property. Together with its list of "sensitive locations," the CCIA all but eliminates concealed carry in virtually all of New York. In fact, when asked whether there would be *any* permissible locations left for public carry, Governor Hochul responded "probably some streets."[2]

At bottom, the CCIA stands in **direct defiance** to *Bruen*, replacing the repudiated "proper cause" requirement with a "good moral character" standard that vests unbridled discretion in licensing officials to evaluate the bona fides of law-abiding persons through an onerous, time-consuming, costly, and constitutionally objectionable process. Then, even if an applicant is successfully able to run the gauntlet and *obtain* a license, the CCIA makes it virtually impossible to *use* that license in any meaningful way to carry a handgun outside the home, declaring great swaths of public and private places to be entirely off limits to firearms. Demonstrating no good-faith effort to comply with the Supreme Court's mandate, the CCIA instead nearly extinguishes the right of "ordinary, law-abiding citizens … to carry handguns publicly for their self-defense." *Bruen* at 2122, 2150. Plaintiffs, together with countless other law-abiding New Yorkers, are being irreparably harmed each day by what the district court described as a "patently unconstitutional" law – which eviscerates the right to carry firearms in public for self-defense – remains in place.

---

[2] *See* M. Kramer & D. Brennan, "*Fresh off Primary Win, Gov. Kathy Hochul Dives Right into Guns – Who Can Get Them and Where They Can Take Them,*" CBS N.Y., https://cbsn.ws/3HoZLJM (June 29, 2022).

**Procedural Background.** Plaintiff Antonyuk's challenge to the CCIA was initially filed in the district court on July 11, 2022, but that action was dismissed without prejudice based on lack of standing, including as to organizational plaintiffs such as Gun Owners of America, who were representing the interests of the additional plaintiffs who are now named in this case. *Antonyuk v. Bruen* (*Antonyuk I*), 2022 U.S. Dist. LEXIS 157874 (N.D.N.Y. Aug. 31, 2022).

On September 20, 2022, 19 days after the CCIA took effect, Plaintiffs filed their Complaint for Declaratory and Injunctive Relief in this action, challenging a number of provisions of the CCIA under Section 1983 pursuant to the First, Second, Fifth, and Fourteenth Amendments. JA17-196; JA82-88. On September 22, 2022, Plaintiffs filed their Motion for Temporary Restraining Order, Preliminary Injunction, and/or Permanent Injunction. JA197-212. After Defendants filed a response and after the district court held oral argument, the court granted a Temporary Restraining Order on October 6, 2022, enjoining several provisions of the CCIA. *Antonyuk v. Hochul*, 2022 U.S. Dist. LEXIS 182965 (N.D.N.Y. Oct. 6, 2022); SA185-237.

Defendants appealed the district court's temporary restraining order to this Court. Docket, 2d Cir. No. 22-2379. On October 12, 2022, a single judge granted Defendants' request for an "administrative stay" and referred their motion to stay pending appeal to a panel for consideration. 2d Cir. No. 22-2379, Document 39.[3]

---

[3] Defendants' first appeal was mooted and voluntarily dismissed.

On October 13, 2022, Defendants filed a 95-page Opposition to Plaintiffs' Motion for Preliminary Injunction, plus over 500 pages of exhibits.  On October 22, 2022, Plaintiffs filed their reply.  The district court heard over two hours of argument on October 25, 2022[4] and, on November 7, 2022, issued a preliminary injunction, supported by a 184-page opinion.  *Antonyuk v. Hochul*, 2022 U.S. Dist. LEXIS 201944 (N.D.N.Y. Nov. 7, 2022); SA1-184.

The district court's opinion meticulously analyzed (i) the standing of each Plaintiff to bring each claim; (ii) whether each Defendant is a proper party to be sued with respect to each provision; and (iii) the constitutionality under the *Bruen* framework of each challenged portion of the CCIA.  After making numerous factual findings and legal conclusions, the district court's opinion enjoined Defendants from enforcing some of the provisions of the CCIA, including:  (i) the requirement to demonstrate "good moral character" as a condition of licensure; (ii) the demand for names and contact information for household members; (iii) the demand for three years of social media accounts; (iv) the demand for "such other information" as necessary; and (v) the prohibition on firearms in some "sensitive locations," including certain healthcare settings, places of worship, parks, zoos, airports, buses, places where alcohol is served, theaters, conference centers, banquet halls, and "any gathering of individuals to collectively express their constitutional rights to protest or assemble."  SA182-184.  The district court also enjoined the CCIA's ban on firearms on private property.  SA184.

---

[4] *See* https://bit.ly/3WPtBwo (Preliminary Injunction Hearing Transcript).

On November 8, 2022, some of the Defendants (the State defendants and Syracuse Chief of Police Joseph L. Cecile) appealed again.[5]  Their appeal was docketed on November 10, 2022 (*see* Docket, 2d Cir. 22-2908) and, on November 12, 2022, Defendants again sought both an administrative stay and a stay pending appeal. No. 22-2908, Document 18.  Before Plaintiffs could respond, this Circuit again granted an "emergency interim stay."  Document 31.  On November 19, 2022, Plaintiffs filed their Response in Opposition to Defendants' Motion.  Document 38. This Circuit granted Defendants' Motion on December 12, 2022, without reasoning or analysis.  Document 75.

On December 21, 2022, Plaintiffs filed an Application for Vacatur with the U.S. Supreme Court.  The Court ordered Defendants to file a response, and later denied Plaintiffs' application.  However, Justice Alito, joined by Justice Thomas, issued a statement explaining that the CCIA "presents novel and serious questions under both the First and Second Amendments," explaining that the "District Court found, in a thorough opinion, that the [Plaintiffs] were likely to succeed on a number of their claims." *Antonyuk v. Nigrelli*, 2023 U.S. LEXIS 396 (Jan. 11, 2023).  Justices Alito and Thomas then criticized this Court's stay as having been issued without "any explanation for its ruling," but agreed with the Court's decision not to weigh at

_____

[5] With the State Defendants and Chief Cecile being the exceptions, the other Defendants below (sheriffs and district attorneys) neither defended the CCIA's constitutionality nor objected to the district court's injunction halting its enforcement.  SA7.

present, out of "respect for the Second Circuit's procedures in managing its own docket." *Id.* at *1.

## STANDARD OF REVIEW

The standard for a preliminary injunction requires Plaintiffs to "establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "In cases alleging constitutional injury, a strong showing of a constitutional deprivation that results in noncompensable damages ordinarily warrants a finding of irreparable harm. Likelihood of success on the merits is therefore 'the dominant, if not the dispositive, factor.'" *A.H. v. French*, 985 F.3d 165, 176 (2d Cir. 2021).

On review, this Court applies a "deferential abuse of discretion standard [and,] as long as the district court did not act arbitrarily … will overturn the preliminary injunction only if the district court made an error of law or a clearly erroneous finding of fact." *Red Earth LLC v. United States*, 657 F.3d 138, 144 (2d Cir. 2011). Finally, the "'status quo' in preliminary-injunction parlance is really a 'status quo ante,'" which "shuts out defendants seeking shelter under a current 'status quo' precipitated by their wrongdoing." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 n.5 (2d Cir. 2018).

## SUMMARY OF THE ARGUMENT

Appealing the district court's grant of a preliminary injunction, Defendant-Appellant Chief of Police Joseph L. Cecile ("Chief Cecile") defends the Concealed Carry Improvement Act ("CCIA") with the claim that New Yorkers have the right to "feel safe" and "expect[] a location free of firearms" in the very places New Yorkers licensed to carry firearms have *always* lawfully carried arms. Without providing any evidence, citation to legal authority, or even a colorable theory, Chief Cecile argues that the CCIA is a vital tool to stop an alleged epidemic of gun violence. But as Chief Cecile's own sergeant has explained, "[h]omicide cases … are usually in connection to gang activity"[6] – not by carry license holders. Indeed, there is absolutely no evidence that the CCIA will have any negative effect on public safety, as it regulates the conduct only of the most law-abiding members of society who have undergone the rigorous process to become licensed.[7] In fact, as the district court concluded and as the Supreme Court has indicated, the bearing of arms by "the people" likely *contributes to* public safety. But regardless of what modern Americans (including government officials) may think of the "right to … bear arms," this nation's Founders decided that it was a protection "necessary to the security of a free State," the exercise of which "shall not be infringed."

---

[6] *See* Smith, J., 2021 Homicide Rate in Syracuse Unchanged from 2020, WAER88.3, available at https://bit.ly/3kVQhxY.

[7] *See* Debunking the Myth of "Concealed-Carry Killers," available at https://herit.ag/3kQNaqZ.

Arguing that Plaintiffs did not have standing to bring suit against him, Chief Cecile first claims that a stated intent to visit the Rosamond Zoo in Syracuse "within the next 90 days" is not concrete enough for his liking. On the contrary, Plaintiffs need not incriminate themselves to law enforcement before having standing to challenge a "patently unconstitutional" law. Second, Chief Cecile claims that his statement that he "would enforce the CCIA" does not constitute a credible threat of enforcement. Yet without skipping a beat, Chief Cecile argues that the CCIA is a "critical tool" that he must employ to keep residents of his city safe. Third, Chief Cecile claims that Plaintiffs must demonstrate they "*will* be arrested" and have "*certain* confiscation" of their firearms in order to obtain standing – precisely what this Court and the Supreme Court have stated is *not required*. Lastly, in arguing that Plaintiffs do not have standing for any other location but the Rosamond Zoo, Chief Cecile admitted that Plaintiffs *do* have standing as to that location.

Next, Chief Cecile argues that Plaintiffs will not suffer irreparable harm from him because they have not alleged, to his satisfaction, that any of them is a *resident* of the City of Syracuse. Of course, residency is not a requirement for standing. In fact, Chief Cecile has admitted that the Rosamond Zoo where Plaintiff Johnson regularly visits is within his jurisdiction, has "little doubt" his officers would respond to a man-with-a-gun call at the Zoo, and that he "would enforce" the CCIA if such a complaint were made against Plaintiffs.

Claiming that Plaintiffs are unlikely to succeed on the merits of their claims, Chief Cecile claims that the Rosamond Zoo is not just a zoo, but has "additional

protections" under the CCIA. But Chief Cecile does not actually identify with specificity what these other "protections" are, aside from speculating that "presumably" there is some sort of government building within the Zoo, and that various educational instruction occurs there from time to time. But by this logic, the entire Adirondack mountains would become a "sensitive location" because of a few college students on a backpacking trip.

Next, Chief Cecile claims that the balance of the equities favors him, on the theory that *law-abiding* and *licensed* gun owners peaceably carrying firearms in public (*i.e.*, the status quo for New York's entire history) will suddenly now cause a public safety crisis of unprecedented magnitude. But the mere exercise of an enumerated constitutional right cannot possibly serve as the predicate to balance away the ability of Americans to exercise that right.

Finally, Chief Cecile argues that Syracuse has a "history of firearm regulation" which justifies the CCIA. Yet upon critical analysis, it becomes readily apparent that the historical record strongly favors Plaintiffs. Indeed, this country's history is replete with examples of colonists and early Americans possessing firearms in *all of the places* the CCIA now declares off limits – (i) public squares, commons, and greens, (ii) public assemblies, (iii) taverns and while consuming alcohol, (iv) during travel, (v) on private property, (vi) in churches, and (vii) *especially* while exercising other constitutional rights. Contrary to Defendants' claims that guns can be banned almost anywhere, a broad and enduring historical tradition demonstrates that early Americans carried their arms almost everywhere.

The CCIA's enjoined provisions are without historical support, and thus violate the Second Amendment. This Court should affirm the district court's opinion and vacate its stay of the preliminary injunction below.

## ARGUMENT

Chief Cecile "doth protest too much" with his full-throated defense of the Concealed Carry Improvement Act and the City of Syracuse's purported "need[] to enforce and limit the proliferation of firearms" carried by law-abiding, responsible gun owners "in places where the public deserves to feel safe." Cecile Br. 2. Demonstrating no sense of irony, Chief Cecile first references Armory Square – a place historically used for the keeping of arms – as a prime example of a place where people should "have an expectation of a location free of firearms." *Id.* But contrary to Chief Cecile's belief, "feel safe" is not a factor the Supreme Court has provided for analyzing a Second Amendment challenge. *See Bruen* at 2126 n.3 ("The right to keep and bear arms … is not the only constitutional right that has controversial public safety implications.") (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 783 (2010)); *see also id.* at 2157 (Alito, J., concurring) (rejecting the idea that concealed carry licensing laws will deter acts of violent crime by criminals); SA77-78 (concluding that safety is actually likely *enhanced* by firearms lawfully carried in public).

Chief Cecile claims, without citation to authority, that in "2022 alone ... there were 757 shots fired incidents in the City, 166 of which resulted in known injury or fatality." Cecile Br. 2. While Chief Cecile may accurately be quoting statistics applicable to Syracuse, he never allowed the district court an opportunity to review

this information, this being the first time it has been briefed.  Moreover, at best these data appear to be missing important context, as the City in 2022 reportedly had "[t]he lowest number of … homicides … in a decade."[8]  Nor has Chief Cecile explained how many of the purported 166 City-wide shootings were committed by licensed concealed carry holders (those governed by the CCIA) as opposed to, for example, violent felons who already are prohibited from obtaining a carry license, or even possessing a firearm.  Plaintiffs submit that it is highly likely that *not a single one* of these Syracuse shootings was committed by a New Yorker licensed to carry a handgun. Chief Cecile's attempt to paint the CCIA as a law necessary to solve the City's problem of gun violence is entirely unpersuasive.

## I.  THE DISTRICT COURT PROPERLY FOUND STANDING.

Chief Cecile spends nearly five pages of his brief summarizing a plethora of precedents discussing all manner of aspects of standing.  *See* Cecile Br. 8-13.  After amassing this great number of authorities, Chief Cecile claims that Plaintiff Johnson did not have standing in this case as against Chief Cecile, raising what appear to be four arguments in support.  *Id.* 13-16.

First, Chief Cecile alleges that Johnson's declaration "is bereft of any specific facts as to any actual damages suffered or risked by going to the Rosamond Zoo," claiming that Johnson's statement of intent to visit the Zoo with his firearm "at least once, within the next 90 days … is hardly concrete and particularized to overcome

---

[8] A. Hayes, "*Syracuse Homicides in 2022: The Lowest Number of Deaths in a Decade*," SYRACUSE.COM, https://bit.ly/3jffWkB (Jan. 4, 2023).

anything more than a 'some day' intention." *Id*. 13-14 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)). Apparently Chief Cecile would like Johnson to provide him with a specific date, time, and location. But the Supreme Court has rejected such a requirement to establish standing; Plaintiff Johnson ("Johnson") need not confess to committing a crime, nor must he otherwise "expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007) ("[W]here threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat – for example, the constitutionality of a law threatened to be enforced.").

Indeed, the CCIA prohibits Johnson from carrying a firearm for self-defense at the Rosamond Zoo, "a course of conduct arguably affected with a constitutional interest[] but proscribed by a statute," and he has "allege[d] 'an intention to engage in'" such conduct with imminent specificity. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298 (1979)); *Bruen* at 2122 ("[T]he Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home."). The "actual damage[] suffered or risked by going to the Rosamond Zoo," Cecile Br. 13, is the threat of prosecution for – and resulting deterrence against – engaging in constitutionally protected conduct, whose loss "for even minimal periods of time[] unquestionably constitutes irreparable injury" for purposes of a preliminary injunction. *Elrod v.*

*Burns*, 427 U.S. 347, 373 (1976).  Moreover, Johnson need only allege "that a prosecution is remotely possible" under these circumstances for this challenge to be "susceptible to resolution by a federal court." *Babbitt*, 442 U.S. at 299.  Johnson has met his burden.

Second, Chief Cecile claims that "his comments at a press conference," to the effect that he "would enforce the CCIA on a 'complaint driven' basis," do not establish a credible threat of enforcement for Johnson or anyone.  Cecile Br. 8, 14.  On the contrary, as the district court explained, "s[t]anding may not be evaded by even the most reluctant of defendants … by saying that he or she is 'only' going to enforce the CCIA to the limited extent of seizing the license holder's valuable personal property (purchased for self-defense), because such a seizure is pursuant to a criminal proceeding initiated under the CCIA, and the right in question is one enumerated in the Constitution."  SA44.  Indeed, even complaint-driven enforcement is still enforcement.

Chief Cecile has never disputed the accuracy of his quoted statement and has never (and still does not) disavow enforcement of the CCIA.  *See Babbitt*, 442 U.S. at 302 ("the State has not disavowed any intention of invoking the criminal penalty provision ... Appellees are thus not without some reason in fearing prosecution for violation of the ban…."). Quite to the contrary, in fact, Chief Cecile's brief mounts a full-throated defense of and explanation as to why the CCIA's provisions are necessary, claiming that the public "ha[s] an expectation of a location free of firearms" in "places where the public congregate," including in "parks" such as the ones that

Johnson says he "routinely" visits, and presumably the Rosamond Zoo, which Johnson announced his intent to visit. Cecile Br. 2. In other words, although attempting to downplay his prior statement about enforcing the CCIA, Chief Cecile's brief actually makes all the more pellucid his intent to robustly enforce the CCIA – an allegedly "critical tool in the City's ability to protect its residents" – against responsible, law-abiding gun owners like Johnson, who have gone through the rigorous process to become licensed to carry firearms. *Id.* It is thus far from "remotely possible" or "imaginary or speculative" that Johnson would be arrested for exercising his Second Amendment rights to public carry at the Rosamond Zoo or in Syracuse generally. This certainly meets the Supreme Court's test for a credible threat sufficient to provide standing. *See Babbitt*, 442 U.S. at 298-99.[9]

Third, Chief Cecile speculates that Johnson would only be arrested based on a "complaint" after being caught with a firearm, which the Chief apparently believes is unlikely. Cecile Br. 15. But other than direct interaction with law enforcement (such as a traffic stop, a bag check, or a stop and frisk), a member of the public calling the police is the only way the CCIA would *ever* be enforced, short of Johnson turning himself in to police after violating the CCIA. In reality, Chief Cecile has laid out a reasonably likely scenario where he would enforce the CCIA against Johnson – being discovered carrying his firearm, and having the police called to respond.

---

[9] *See also Avitabile v. Beach*, 277 F. Supp. 3d 326, 331-32 (N.D.N.Y. 2017) (the plaintiff "publicly announced his own" intent to violate the law, "conduct that would be likely to result in his prosecution." "Indeed, it is hard to imagine what, if any, additional conduct he might be required to engage in to trigger a more 'credible' threat of prosecution short of actually committing the proscribed act.").

Chief Cecile claims that Johnson has not "been threatened with *certain* confiscation of his firearm, revocation of his license, or prosecution," and that he has not alleged that he "*will be*" arrested by the Syracuse Police Department while at the Rosamond Zoo. Cecile Br. 15-16 (emphasis added). But that is not the test for standing – Johnson must demonstrate a "credible" threat of enforcement, not a "certain[ty]," nor does he have to wait for his actual arrest to occur. *See Babbitt*, 442 U.S. at 302-03 (noting that even if a "criminal penalty provision has not yet been applied ... when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative a plaintiff need not 'first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute'" and further explaining that the statute "authorize[d] imposition of criminal sanctions against" violators, and the plaintiffs "will in the future engage in" proscribed conduct); *see also League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) ("Damocles's sword does not have to actually fall ... before the court will issue an injunction.").

Fourth, Chief Cecile claims that the Zoo is the "only location alleged with any (barely) cognizable nexus to Chief Cecile." Cecile Br. 13. It is unclear what Chief Cecile hopes to accomplish with this statement, other than to *concede that there is at least one* location in this case with a "cognizable nexus" to his jurisdiction.[10] To quote

---

[10] To be sure, visits to the Rosamond Zoo are not Johnson's only nexus for standing against Chief Cecile. Indeed, he has stated an intent to "routinely" carry his firearm in all sorts of additional locations within Onondaga County, and Plaintiffs have explained that "Defendant Cecile's jurisdiction includes places where Plaintiffs intend to be in violation of the CCIA." JA24 at ¶ 14; JA135, 137-138, 140. As the

Futurama, "technically correct is the best kind of correct." *See Lane v. United States*, 2020 U.S. Dist. LEXIS 54545, at *14 n.51 (N.D. Tex. Mar. 30, 2020). Johnson's standing as to Chief Cecile is broader than simply the Rosamond Zoo, but the Zoo is certainly sufficient.

## II. THE DISTRICT COURT PROPERLY FOUND JOHNSON WOULD SUFFER IRREPARABLE HARM.

Placing all his eggs into one basket, Chief Cecile argues that "Plaintiff Johnson does not claim to be a resident of the City" of Syracuse. Cecile Br. 17. Based on that single premise, Chief Cecile concludes that Johnson was unable to show irreparable harm below. *Id.* 19. But Chief Cecile's premise is faulty, and his conclusion fails, for one very simple reason. That is because there is nothing requiring that Johnson be a *resident* of the City of Syracuse[11] as a condition of Chief Cecile being a proper Defendant as to the Rosamond Zoo and all other locations within the City where he has stated his intent to enforce the CCIA. Focusing entirely on Johnson's residency, Chief Cecile fails to recognize that *any person* who resides within New York, who

---

district court explicitly noted, the Defendants (including Chief Cecile) waived the opportunity to cross-examine Johnson at the court's October 25, 2022 hearing. SA38. Nor has Chief Cecile ever alleged that such locations (other than "Longhorn Steakhouse") are *not* within Syracuse and thus outside his jurisdiction. *See, e.g.*, JA140 ("routinely carr[ies his] firearm when out and about in public, including" at various locations in Onondaga County, including "gas stations, grocery stores, home improvement stores, big box stores"); JA137 (eating at restaurants that serve alcohol); JA135 ("routinely carr[ies his] handgun when [he] leave[s] home"); JA135-136 ("routinely" in "numerous parks").

[11] Not that it matters, but if Chief Cecile had any questions about Johnson's residency, he could have inquired – yet "Defendants waived their right to cross-examine Plaintiff Johnson at the Preliminary Injunction Hearing on October 25, 2022." SA38.

possesses a valid concealed carry license, and who intends to visit the Zoo with his firearm, could obtain injunctive relief against Chief Cecile – the chief law enforcement officer in the City – who has admitted that the Zoo is within the City (Cecile Br. 19; ECF#47-9 at n.8); has admitted that his jurisdiction includes the Zoo (ECF#47-9 at n.8); has admitted that his department would respond to a call to "crimes in progress" at the Zoo (*id.*); and has stated that he would enforce the CCIA in such circumstances. Johnson's residency, then, is nothing more than a straw man designed to distract. Chief Cecile appears to admit as much, later claiming that Johnson "did not claim to be a resident *or even a frequent visitor*." Cecile Br. 24 (emphasis added). But even that is not required. Johnson explained that he regularly visits the Zoo, and announced his intent to visit the Zoo and to do so armed. That is enough. Certainly, Chief Cecile has pointed this Court to no authority for the proposition that the Second Amendment right to bear arms in public in Syracuse extends only to those who have alleged, to the Chief's satisfaction, residency within the City.

Next, Chief Cecile argues that no irreparable harm to Johnson could occur "with respect to the Rosamond Zoo" – at least not from Chief Cecile. Cecile Br. 19. In support of this claim, Chief Cecile claims that the Zoo "is not a City-owned zoo," but rather "is owned and controlled by the County," and has "its own police force (County Park Rangers)." *Id.* 19-20. Of course, Chief Cecile has admitted that his officers would respond to "high priority calls or crimes in progress" within the Zoo. SA43; ECF#47-9 at 9 and n.8 ("not suggesting that [the Syracuse Police Department] would decline to respond to an emergency at the Zoo" and "does not doubt that SPD

has jurisdiction to make arrests, and would indeed to respond to high priority calls or crimes in progress...").  As a report of a person carrying a firearm in a "sensitive location" is, by definition, a "crime[] in progress," the district court had "little doubt that, if there were a gun incident reported at the Zoo, the Syracuse Police Department would promptly respond...." SA43.  Omitting any reference to his admissions and the district court's conclusion, Chief Cecile instead focuses on the district court's statement that "some uncertainty appears to exist regarding whether [a] 911 call would result in the dispatching of a Syracuse Police Officer or a County Deputy Sheriff … in addition to any County Park Ranger available."  SA43; Cecile Br. 20-21.  But by that logic, no one could ever bring a challenge to a "sensitive location" situated in a location with overlapping jurisdictions (*i.e.*, every "sensitive location" within the State), because each potential defendant who enforces the law (city police, county sheriff, park ranger, state police, and who-knows-who-else) could simply point the finger at the others to avoid liability.  That is not the law.

## III.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS AGAINST DEFENDANT CECILE.[12]

Chief Cecile claims that Plaintiffs are unlikely to prevail on the merits of their challenge to the CCIA's ban on firearms in zoos, claiming that "the Rosamond Zoo [is] more than simply a 'zoo' and enjoy[s] additional protections as a 'sensitive location.'" Cecile Br. 22.  As a preliminary matter, Chief Cecile apparently does not challenge Plaintiffs' likelihood of success on the merits with respect to the Rosamond Zoo *as a*

---

[12] Plaintiffs address the arguments made in Chief Cecile's Section III.A above.

_zoo_, but rather only to the extent that it allegedly is "_more than_ simply a 'zoo'...." _Id._ (emphasis added). In failing to challenge Plaintiffs' likelihood of success with respect to _the Zoo itself_, Chief Cecile (i) either concedes the issue or (ii) for some reason believes that the _entire property_ within the boundaries of the Rosamond Zoo somehow can be declared off limits to firearms on the theory that contained somewhere within its borders is a tiny speck of real estate designated as a separate "sensitive location." But under that logic, in addition to its classification as a "sensitive location" because it is a park, the entire Catskills State Park would _also_ be a "sensitive location" because there is a playground _somewhere_ within its 286,000 acres. On the contrary, the idea that entire facilities can be declared sensitive places based on some limited, partial, occasional, and entirely tangential use stretches _Bruen_ (not to mention logic) beyond its breaking point.

Next, Chief Cecile speculates – but never offered any evidence below demonstrating[13] – that "[p]resumably, the Rosamond Zoo contains County building(s), such as those housing the Park Rangers assigned to the Rosamond Zoo." Cecile Br. at 23 (emphasis added). Chief Cecile offers not a shred of evidence that such a place _actually_ exists, much less does he describe with any specificity its purpose, control, and use. Chief Cecile cannot seriously expect this Court to find Plaintiffs unlikely to succeed on the merits based on his _speculation_ that the

---

[13] Defendant made this claim "upon information or belief" below (Opp. 20) but, given the opportunity to present evidence at two separate hearings in the district court, did not do so.

Rosamond Zoo "presumably" contains a certain type of government building within its borders. Even so, the CCIA does not ban firearms merely in any "County building(s)," but in places that have the "purpose of government administration...." N.Y. Penal Law § 265.01-e(2)(a). Indeed, any administrative offices within the Zoo are not for the "purpose of *government administration*" (like a courthouse, polling place, or legislative assembly), but rather *administration of the Zoo* on behalf of the public. *See Christian v. Nigrelli*, 2022 U.S. Dist. LEXIS 211652, at *18 (W.D.N.Y. Nov. 22, 2022) (discussing "exceptional circumstances under which one could not carry arms, such as before justices of the peace and other government officials").

Finally, Chief Cecile claims that "the Rosamond Zoo operates, in part, as an educational facility" because it contains "a teaching hospital for Cornell University College of Veterinary Medicine's zoological medicine program." Cecile Br. 23. Unsurprisingly, Chief Cecile never explains the nature and scope of this "program." But a place does not become an "educational facility" simply because learning occurs there. Indeed, the Cornell program states merely that "[v]eterinary faculty and students *visit the zoo* to oversee preventative medical programs and offer medical and surgical treatments."[14] Under Chief Cecile's logic – that a place becomes an "educational facility" merely because students and teachers "visit" it – the entire Adirondack mountains would be a "sensitive location" because Cornell University offers a "6 Day Backpacking in the Adirondacks" trip as part of its Physical Education

---

[14] *Zoological Medicine*, CORNELL UNIV., https://bit.ly/3RdaM5n (last visited Jan. 29, 2023).

department.[15]   It is a small wonder that Chief Cecile does not also claim the Rosamond Zoo to be a "location providing health ... care or services" (N.Y. Penal Law § 265.01-e(2)(b)), and thus a "sensitive location" under the CCIA, on the grounds that Zoo staff provide dental exams to camels and maternity services to birds by incubating their eggs.

In short, Chief Cecile has failed to explain the scope and the nature of various "presum[ed]" facilities at the Rosamond Zoo; has failed to explain how these facilities fall within the scope of any of the other "sensitive locations" within the CCIA; and has failed to show how the CCIA's ban on firearms in such "sensitive locations" is justified by any historical tradition under *Bruen*.[16]

## IV.   THE DISTRICT COURT PROPERLY HELD THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVORED PLAINTIFFS.

Chief Cecile correctly states the standard that the "public interest and balances of equities merge" when the government is a party, but then merely repeats various arguments previously made with respect to standing, the merits, and

---

[15] *6 Day Backpacking in the Adirondacks*, CORNELL OUTDOOR EDUC., https://bit.ly/3Hktao3 (last visited Jan. 29, 2023).

[16] In fact, Defendant does not offer a single historical analogue at all, nor does he even begin to conduct a *Bruen* analysis.  In fact, his brief does not even reference the Supreme Court's decision.   To be sure, in his introductory "preliminary statement," Defendant alleges that "the City has a history of firearm regulation that goes back to at least 1894, when it was the City's chief of police who was 'authorized to issue permits [to carry pistols in the City] for such purpose, in proper cases.'" Cecile Br. 2.  Of course, that is just a single city with a very limited population, which is an unhelpful historical source under *Bruen*.  *See Bruen* at 2154.  This also represents a single historical source, which "does not a tradition make."  *Id.* at 2155.  Next, being in 1894, this reference is centuries after the Founding era (and decades after the Reconstruction era), making it completely irrelevant under *Bruen*.  *Id.*  Finally, Chief Cecile's historical reference deals with permitting, whereas Defendant's brief deals with "sensitive locations" – different issues entirely.

irreparable harm.[17]  Cecile Br. 24-25.  Chief Cecile then makes a single, entirely conclusory claim about "the City's imperative to protect all of its citizens – an imperative that has been impeded by the proliferation of guns in the City and ever-changing gun laws." *Id.* 25.  But as explained above, Chief Cecile has entirely failed to provide any theory (much less any evidence) as to whether or how the CCIA will reduce gun violence within the City, as the CCIA involves only the carry of firearms by law-abiding gun owners who have gone through a rigorous process to become licensed by the State to bear arms.  It seems unnecessary to repeat the maxim that "guns don't kill people; people kill people," but Chief Cecile simply cannot claim a public safety crisis created by nothing more than the exercise of constitutional rights by ordinary, law-abiding Americans.  Indeed, if the Chief's "compelling need" argument were meritorious, then *Bruen* would have been decided the other way, accepting rather than rejecting New York's "argument [to] in effect exempt cities from the Second Amendment and … eviscerate the general right to publicly carry arms for self-defense.…" *Bruen* at 2134.

And even if Chief Cecile had demonstrated some actual public safety benefit to be derived from the CCIA's onerous restrictions, it would come at the cost of the disarmament of law-abiding gun owners, an unacceptably high cost, as "[t]he right to keep and bear arms … is not the only constitutional right that has controversial public safety implications." *McDonald*, 561 U.S. at 783.  Such enumerated rights

---

[17] The scant points raised by Chief Cecile in this section have been dealt with *supra*, and are adopted by reference.

cannot be balanced away by legislators, police chiefs, or even judges, because "the Second Amendment is … the very product of an interest balancing by the people … it … elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense…." *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008).

Despite the Chief's claim of "need" to enforce additional gun laws, he cannot plausibly claim he is somehow harmed from temporarily halting enforcement of an unconstitutional law: "the public consequences in employing the extraordinary remedy of [injunctive relief]" are not just the vindication of constitutional rights but also the prevention of their egregious curtailment. *Yang v. Kosinski*, 960 F.3d 119, 135-136 (2d Cir. 2020). Indeed, it is *always* in the public interest to enjoin an unconstitutional law. *See, e.g.*, *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982). The government has no "interest in the enforcement of an unconstitutional law." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); *see also Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 500 (S.D.N.Y. 2019) (same); *Dzhabrailov v. Decker*, 2020 U.S. Dist. LEXIS 91892, at *31 (S.D.N.Y. May 26, 2020) (same); *Sajous v. Decker*, 2018 U.S. Dist. LEXIS 86921, 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2018) ("The public interest is best served by ensuring [] constitutional rights … are upheld.").

In short, Chief Cecile has offered nothing for this Court to find that the district court abused its discretion in holding that Plaintiffs made a "strong showing that the balance of equities tips in their favor and that the public interest would not be disserved by the Court's granting of the" preliminary injunction. SA180. And

because "securing First Amendment rights is in the public interest," securing Second Amendment rights is likewise in the public interest. *N.Y. Progress & Prot. PAC*, 733 F.3d at 488.

## V. THE HISTORICAL RECORD SUPPORTS PLAINTIFFS, NOT DEFENDANTS.

Both Defendant Cecile and the State Defendants (together, "Defendants") have argued that this nation's historical tradition supports the CCIA under the *Bruen* framework. Appellants' Br. 21–24; Cecile Br. 2 (claiming "the City has a history of firearm regulation that goes back to at least 1894, when it was the City's chief of police who was 'authorized to issue permits [to carry pistols in the City] for such purposes, in proper cases"). Additionally, Defendant Cecile "adopt[ed] the arguments raised in the State Defendants' Appellate Brief concerning the constitutionality of the CCIA." Cecile Br. 24.

However, contrary to Defendants' revisionist attempts at reading a broad anti-gun tradition into American history, countless historical sources actually support the opposite – a tradition of firearms present always and everywhere – either allowing or even *requiring* arms in many locations that are now off limits under the CCIA. Such locations where the founding generation frequently went armed include (i) public squares, commons, and greens, (ii) public assemblies, (iii) taverns and while consuming alcohol, (iv) during travel, (v) on private property, (vi) in churches, and (vii) *especially* while exercising other constitutional rights.

For example, Boston Common is reportedly the nation's first "public park,"

having been established in 1634.[18]  More than a century later, nearby Faneuil Hall

served as a "site of meetings, protests, and debate" during the Revolutionary War,[19]

hosting a "volunteer militia company" with the mission to "prepare its members to

serve as officers in the enrolled militia companies," which included meetings there

(including maintaining an "armory") and later "at a tavern in town and drill[s] on the

[Boston] Common."  Leonid Kondratiuk, A Guide to the Ancient and Honorable

Artillery Company of Massachusetts at 2, 9.[20]  This single historical record evidences

a rich history of private persons openly possessing arms (i) in public parks, (ii) at

gatherings of individuals to engage in protest and assembly, and (iii) at a tavern that

served alcohol.  Similarly demonstrating an enduring historical tradition:

> It is a most strange historical coincidence that on April 19, 1689, the
> Concord militia was assembled on the Village Green and started from
> there for Boston to overthrow Governor Andros; that on April 19, 1775,
> at the very same hour, the militia was again assembled on the Concord
> Green to begin the fight of the Revolutionary war; that on April 19, 1812,
> the militia was again called out to participate in the second war with
> Great Britain; that on April 19, 1848, the soldiers met on the Concord
> Green to take up arms to fight in the Mexican war; that on April 19,
> 1861, the Concord Green was the place of assembly and the starting
> point of the brave boys to fight in the Civil War; and that on April 19,
> 1898, resolutions were passed by the Concord Militia to respond to the
> call for troops for the Spanish war.  [F.S. Dennis, The Norfolk Village
> Green (1917) at 9.][21]

Indeed, such broad acceptance of armed public assembly dated back to colonial

Massachusetts, which *required* "all such persons ... come to the publike assemblyes

---

[18] https://www.boston.gov/parks/boston-common.
[19] https://www.nps.gov/bost/learn/historyculture/fh.htm.
[20] *See* L. Kondratiuk, A Guide to the Ancient and Honorable Artillery Company of Massachusetts, https://bit.ly/3Y6uCkT.
[21] *See* F. Dennis, The Norfolk Village Green (1917), https://bit.ly/3HITCcK.

with their muskets…." 1 <u>Records of the Governor and Company of the Massachusetts</u> <u>Bay in New England, 1628–1641</u>, 190 (Nathaniel B. Shurtleff ed., 1853), <u>https://bit.ly/3XzOIEg</u>. Founding-era New York had a similar tradition of sanctioning armed public gatherings, requiring militia colonels to organize their local regiments at least twice a year for examination and training at town centers and undeveloped land that later became the public parks of today. JA334, 346. Contemporaneously to the 1773 Boston Tea Party, armed colonists descended on Boston and "bought up" all the "pistols in town," thereafter meeting "to the number of five or six thousand … in the Old South Meeting house…." W. Sargent, <u>Letters of John Andrews, Esq., of</u> <u>Boston, 1772-1776</u>, Massachusetts Historical Society, at 12.[22] The following year, when General Gage attempted to stop a public assembly protesting the Crown, "there was upwards of three thousand men assembled there … being sufficiently provided for such a purpose; as indeed they are all through the country – every male above the age of 16 possessing a firelock with double the quantity of powder and hall enjoin'd by law." *Id.* at 34.

Recognizing the dangers inherent to traveling, colonial Virginia and Massachusetts *required* that travelers arm themselves. *See* William Waller Henning, 1 <u>The Statutes at Large, Virginia 1619</u>, 127 (1823), <u>https://bit.ly/3J92ZmP</u>; 1 <u>Records</u> <u>of the Massachusetts Bay</u>, *supra*, at 85, <u>https://bit.ly/3WyeoQr</u>. Virginia also *mandated* those working outside to keep arms within ready access for self-defense. Henning, *supra*, at 198, <u>https://bit.ly/3kCAvI8</u>. This tradition of armed travel

---

[22] <u>https://bit.ly/3DjsuOJ</u>.

continued through the Revolutionary period. *See* Sargent at 6 ("April 11, 1776 ... Benjamin Hitchborn ... sat near the chimney ... preparing for use a pair of pistols – without which, in those days, one ventured to travel.").

Although perhaps uncomfortable to modern sensibilities, during the founding era, guns and alcohol did indeed mix. For example, one pastor recounted in 1802 encountering "people coming from a militia muster, drunk, and staggering along the lanes and paths…." The Journal of The Rev. Francis Asbury, Bishop of The Methodist Episcopal Church, from August 7, 1771, to December 7, 1815 (1821) at 121.[23] Likewise, "in the fall of 1840 … the Racine Militia gallantly trained til noon, when they adjourned to the Fulton House for dinner, where they all got so drunk they couldn't muster at all in the evening." F.S. Stone, Racine Belle City of the Lakes and Racine County Wisconsin (1916) at 476.[24] A different source recounts that "[t]here had been a muster of a militia company on the church green" where "the members of the company … [were] treated … to sweetened rum…." P. Godwin, A Biography Of William Cullen Bryant, With Extracts From His Private Correspondence (1883) at 16-17 (the date of this event is unclear, but Bryant was born in 1797. In short, "[a]t that time … it was the universal custom, in all regiments of the militia … for the officers, on every muster day, to get gloriously drunk in their country's service." Reminiscences of a Retired Militia Officer, The New-England Magazine Vol. 3 (1832) at 111.[25]

---

[23] https://bit.ly/3DgPVrU.
[24] https://bit.ly/3wyv4N4.
[25] https://bit.ly/3kEqJoJ.

Perhaps one of the most enduring American traditions involves attending religious services while armed.  Immediately preceding the Revolution, Pastor Peter Muhlenberg, a member of the "Black Robe Regiment" – named so by the British who recognized the key role that American pastors played in raising armed resistance – "called upon his parishioners to support the American cause by proclaiming 'there is a time to preach and a time to fight, and now is the time to fight!'  With those words, he displayed the uniform of a Continental colonel and promptly recruited 300 members of his parish."[26]  This mixing of arms and religion was no outlier event – Virginia, South Carolina, and Georgia in fact *demanded* churchgoers attend services armed.  Narratives of Early Virginia, 1606–1625, 273 (Lyon Gardiner Tyler ed., 1907), https://bit.ly/3XRQPTO; 7 The Statutes at Large of South Carolina, 417 (David J. McCord ed., 1840), https://bit.ly/3R3aOg8; 19 The Colonial Records of the State of Georgia, 1768–1773, 138 (Allen D. Candler ed., 1911), https://bit.ly/3GXMXtz.

The above represent merely a few examples of a robust American historical tradition of firearm ownership and use.  Far from supporting the CCIA's limits on the ability of law-abiding persons to bear arms almost anywhere, a broad and enduring historical tradition demonstrates that early Americans carried their arms almost everywhere.  To be sure, Plaintiffs are not obligated to provide such a record in order to successfully challenge the CCIA, yet these sources further demonstrate the utter failure of Defendants to provide relevant historical analogues for acts of infringement

---

[26] "Brigadier General John Peter Gabriel Muhlenberg," Yorktown Battlefield, National Park Service, https://bit.ly/3wZNSFn.

on the Second Amendment through the sort of restrictions the CCIA imposes.

## CONCLUSION

For the reasons stated, this Court should (i) affirm the district court's opinion and order, and (ii) should vacate its stay of that order pending appeal.

Respectfully submitted,

Dated: February 1, 2023

|  |  |
|---|---|
| | */s/ Stephen D. Stamboulieh* |
| Robert J. Olson | Stephen D. Stamboulieh |
| William J. Olson | Stamboulieh Law, PLLC |
| William J. Olson, PC | P.O. Box 428 |
| 370 Maple Ave. West, Suite 4 | Olive Branch, MS 38654 |
| Vienna, VA 22180-5615 | (601) 852-3440 (T) |
| (703) 356-5070 (T) | Stephen@sdslaw.us |
| (703) 356-5085 (F) | *Attorneys for Plaintiffs-Appellees* |
| wjo@mindspring.com | |

31

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, I, Stephen D. Stamboulieh, one of the attorneys for Plaintiffs-Appellees, hereby certify that according to the word count feature of the word processing program used to prepare this brief, the brief contains 8,303 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh