# 22-2908(L)

22-2972 (Con)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

Ivan Antonyuk,

*Plaintiffs–Appellees,*

v.

Steven A. Nigrelli, in his Official Capacity as Acting Superintendent of the New York State Police,

*Defendants–Appellants.*

(*Caption continues inside front cover.*)

On appeal from the United States District Court for the
Northern District of New York — No. 22-CV-986

**BRIEF OF *AMICI CURIAE* THE ASIAN PACIFIC AMERICAN GUN OWNERS ASSOCIATION, THE DC PROJECT FOUNDATION, THE LIBERAL GUN CLUB, THE NATIONAL AFRICAN AMERICAN GUN ASSOCIATION, OPERATION BLAZING SWORD–PINK PISTOLS, AND THE KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY IN SUPPORT OF PLAINTIFFS–APPELLEES AND AFFIRMANCE**

Anna Diakun
Katherine Fallow
Alex Abdo
Knight First Amendment Institute at
    Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
anna.diakun@knightcolumbia.org

*(Caption continues from front cover.)*

Corey Johnson, Alfred Terrille, Joseph Mann, Leslie Leman, Lawrence Sloane,

*Plaintiffs–Appellees*,

v.

Matthew J. Doran, in his Official Capacity as the Licensing Official of Onondaga County, Joseph Cecile, in his Official Capacity as the Chief of Police of Syracuse,

*Defendants–Appellants*,

Kathleen Hochul, in her Official Capacity as the Governor of the State of New York, William Fitzpatrick, in his Official Capacity as the Onondaga County District Attorney, Eugene Conway, in his Official Capacity as the Sheriff of Onondaga County, P. David Soares, in his Official Capacity as the District Attorney of Albany County, Gregory Oakes, in his Official Capacity as the District Attorney of Oswego County, Don Hilton, in his Official Capacity as the Sheriff of Oswego County, Joseph Stanzione, in his Official Capacity as the District Attorney of Greene County,

*Defendants*.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, undersigned counsel certifies that *amici curiae* the Asian Pacific American Gun Owners Association, the DC Project Foundation, the Liberal Gun Club, the National African American Gun Association, Operation Blazing Sword–Pink Pistols, and the Knight First Amendment Institute at Columbia University have no parent corporations and no publicly held corporation owns 10 percent or more of their organization's stock.

*/s/ Anna Diakun*
Anna Diakun

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iii

INTERESTS OF *AMICI CURIAE* .......................................................... 1

INTRODUCTION ...................................................................................... 4

ARGUMENT .............................................................................................. 8

I.    The CCIA's social media registration requirement imposes significant burdens on applicants' First Amendment rights..................... 8

    A.    The requirement chills the exercise of First Amendment rights by compelling applicants to register their social media accounts............................................................................... 8

    B.    The social media registration requirement burdens the rights of applicants to speak anonymously and associate privately online............................................................................ 15

II.    The social media registration requirement violates the First Amendment. .......................................................................... 22

    A.    The social media registration requirement is subject to heightened scrutiny. ............................................................... 22

    B.    The State has not shown that the registration requirement directly and materially advances its interest in preventing unlawful gun violence. .............................................................. 23

    C.    The social media registration requirement is not narrowly tailored. .......................................................................... 27

CONCLUSION.......................................................................................... 30

CERTIFICATE OF COMPLIANCE........................................................ 32

# TABLE OF AUTHORITIES

**Cases**

*Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373 (2021) .................. 21, 23, 30

*Antonyuk v. Hochul*, 1:22-CV-0986 (GTS/CFH), 2022 WL 16744700
  (N.D.N.Y. Nov. 7, 2022) ................................................................... 13

*Buckley v. Valeo*, 424 U.S. 1 (1976) ...................................................... 20

*Cornelio v. Connecticut*, 32 F.4th 160 (2d Cir. 2022) .................................... passim

*Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301 (1965) ........................... 6, 13, 14

*McCullen v. Coakley*, 573 U.S. 464 (2014) ............................................ 28

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) .................. 6, 16, 20, 22

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) ............................ 6, 20

*Shelton v. Tucker*, 364 U.S. 479 (1960) ............................................... passim

*Talley v. California*, 362 U.S. 60 (1960) ........................................... 15, 20

*Terry v. Ohio*, 392 U.S. 1 (1968) ...................................................... 29

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) .................................. 23, 27

*United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013) ............................... 29

*United States v. Jones*, 565 U.S. 400 (2012) .......................................... 11

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536
  U.S. 150 (2002) ........................................................................ 6, 20

**Statutes**

Concealed Carry Improvement Act, N.Y. Penal Law § 400.00 ..................... passim

N.Y. Penal Law § 400.02 ................................................................ 13

## Other Authorities

@keepingpain, Twitter (Sept. 26, 2022, 10:01 PM),
https://perma.cc/2GX6-P4Z5 ............................................................ 25

*About Goodreads*, Goodreads, https://perma.cc/U373-Z837 (last
visited Feb. 2, 2023) ....................................................................... 9

*About Us*, CaringBridge, https://perma.cc/RU5B-Q3P4 (last visited
Feb. 2, 2023) .................................................................................. 10

Alex Leavitt, *"This is a Throwaway Account": Temporary Technical
Identities and Perceptions of Anonymity in a Massive Online
Community*, Procs. of the 18th ACM Conf. on Comput. Supported
Coop. Work & Social Computing 317, 324 (ACM ed., 2015) ........................ 17

Chris Lehman, *Oregon Settles Lawsuit, Forces Out DOJ Civil Rights
Attorney*, OPB (Oct. 11, 2017, 7:35 PM), https://perma.cc/U5QP-
TBNV ........................................................................................... 26

Conor Friedersdorf, *Police Have a Much Bigger Domestic-Abuse
Problem Than the NFL Does*, The Atlantic (Sept. 19, 2014),
https://perma.cc/4WMH-4R2B ........................................................... 19

Desmond Upton Patton, et al., *Stop and Frisk Online: Theorizing
Everyday Racism in Digital Policing in the Use of Social Media
for Identification of Criminal Conduct and Associations*, 3 Soc.
Media & Soc'y 1, 5–7 (2017),
https://journals.sagepub.com/doi/epub/10.1177/205630511773334
4 ................................................................................................... 26

Emily St. James, *Trans Twitter and the Beauty of Online Anonymity*,
Vox (Sept. 23, 2020, 10:30 AM), https://perma.cc/2H5P-44KA ..................... 17

*General Methodology*, Gun Violence Archive,
https://www.gunviolencearchive.org/methodology (last visited
Feb. 2, 2023) .................................................................................... 4

*Global Road Traffic Injuries and Deaths—A Global Problem*, Ctr. for
Disease Control & Prevention (Jan. 10, 2023),
https://perma.cc/HD2E-XD3S ............................................................ 29

J. David Goodman, *Travelers Say They Were Denied Entry to U.S. for Twitter Jokes*, N.Y. Times (Jan. 30, 2012, 1:03 PM), https://perma.cc/7X7Z-4LBQ ............................................................... 25

J. Nathan Matias, *The Real Name Fallacy*, Coral by Vox Media (Jan. 3, 2017), https://perma.cc/ZT9T-YKQF ............................................. 17

James Poulter, *How "ACAB" Became the Universal Anti-Police Slogan*, VICE News (June 8, 2020, 8:00 AM), https://perma.cc/K2NC-NFRB .......................................................... 12

Juan Del Toro & Ming-Te Wang, *Online Racism and Mental Health Among Black American Adolescents in 2020*, 62 J. Am. Acad. of Child & Adolescent Psychiatry 25, 32 (Jul. 18, 2022), https://perma.cc/3UN6-5YWE .......................................................... 18

Michael Levenson, *Judge Overturns Murder Convictions, Citing Use of Rap Lyrics at Trial*, N.Y. Times (Oct. 4, 2022), https://www.nytimes.com/2022/10/04/us/california-racial-bias-gary-bryant-diallo-jackson.html ...................................................... 26

*Past Summary Ledgers*, Gun Violence Archive, https://www.gunviolencearchive.org/past-tolls (last visited Feb. 2, 2023) ................................................................................................ 4

Sara Baker, *Why Online Anonymity is Critical for Women*, Women's Media Ctr. Speech Project (Mar. 11, 2016), https://perma.cc/4N2K-KD9M ....................................................... 19

*Violence Against Trans and Non-Binary People*, VAWnet (2021), https://perma.cc/E2R6-M7Z6 .......................................................... 17

# INTERESTS OF *AMICI CURIAE*[1]

*Amici* are six organizations that are deeply troubled by the social media registration requirement in New York's Concealed Carry Improvement Act, N.Y. Penal Law § 400.00(1)(o)(iv) ("CCIA"). This brief focuses only on that provision of the law; indeed, *amici* are divided about the State's other gun safety efforts, with perspectives ranging from fundamentally opposed to solidly in support. *Amici* are united, however, in the view that the CCIA's social media registration requirement imposes a significant and unjustified burden on individuals' First Amendment rights to free speech and association.

*Amicus* the Asian Pacific American Gun Owners Association ("APAGOA") is a community of Asian Pacific Americans who own guns and advocate for safe and responsible gun ownership. APAGOA has a significant interest in this case as an organization that represents groups that have faced substantial amounts of racially motivated violence, particularly over the past few years, and who have increasingly purchased firearms in response.

---

[1] In accordance with Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* certify (1) this brief was authored entirely by counsel for *amici curiae* and not counsel for any party, in whole or in part; (2) no party or counsel for any party contributed money to preparing or submitting this brief; and (3) apart from *amici curiae*, their members, and their counsel, no other person contributed money to the preparation or submission of this brief. All parties have consented to the filing of this brief.

*Amicus* the DC Project Foundation is a coalition of female gun owners from all fifty states dedicated to protecting and preserving their Second Amendment rights. The DC Project advocates for firearms safety and violence prevention achieved through education, not legislation, encourages the preservation of America's gun culture, and highlights the diversity and rising demographic of female gun owners.

*Amicus* the Liberal Gun Club provides a voice for gun-owning liberals and moderates in the national conversation on gun rights, gun legislation, firearms safety, and the shooting sports. The Club serves as a national forum for discussion of firearms ownership, firearms use, and the enjoyment of firearms-related activities free from political extremism. The Club actively develops and fosters a variety of programs for the purpose of firearms training and firearms safety education, for both gun owners and non-gun owners alike.

*Amicus* the National African American Gun Association ("NAAGA") was founded to defend the Second Amendment rights of members of the African American community. Its mission is to educate about the rich legacy of gun ownership by African Americans, to offer training that supports safe gun use for self-defense and sportsmanship, and to advocate for the inalienable right to self-defense for African Americans. NAAGA has over 50,000 members, and chapters in thirty-eight states.

*Amicus* Operation Blazing Sword–Pink Pistols ("OBSPP") comprises two organizations, Operation Blazing Sword and Pink Pistols, which together advocate on behalf of lesbian, gay, bisexual, transgender, and queer ("LGBTQ") firearm owners, with specific emphasis on self-defense issues. Operation Blazing Sword maintains a network of over 1,500 volunteer firearm instructors in nearly a thousand locations across all fifty states. Pink Pistols, which was incorporated into Operation Blazing Sword in 2018, is a shooting society that honors gender and sexual diversity and advocates for the responsible use of firearms for self-defense. Membership is open to anyone, regardless of sexual orientation or gender identity, who supports the rights of LGBTQ firearm owners.

*Amicus* the Knight First Amendment Institute at Columbia University is a non-partisan, not-for-profit organization that works to defend the freedoms of speech and the press in the digital age through strategic litigation, research, and public education. The Institute's aim is to promote a system of free expression that is open and inclusive, that broadens and elevates public discourse, and that fosters creativity, accountability, and effective self-government. As a general matter, the Institute believes that gun-safety regulation can promote First Amendment rights by helping ensure that citizens are not intimidated from exercising expressive and associational rights. The Institute believes, however, that the CCIA's social media registration requirement imposes a substantial burden on expressive and associational freedoms

3

without materially advancing the State's goal of preventing unlawful gun violence. The Institute is also concerned that this requirement, if not enjoined, may create a precedent for greater government surveillance of individuals' online speech and association in many other contexts.

## INTRODUCTION

On May 14, 2022, ten people were killed in a racially motivated mass shooting at a predominantly Black grocery store in Buffalo, New York. The incident was the 198th of 648 mass shootings that would take place in the United States that year.[2] Acts of mass violence like these shake the foundations of our society. They undermine Americans' sense of safety, making them fearful when they shop for groceries, attend church, or go to school. They can also have the effect of making people less willing to exercise important First Amendment rights—including the right to dissent, to assemble publicly, and to protest—because a sense of safety is often a precondition for peoples' willingness to engage in these activities.

Not long after the Buffalo attack, New York State enacted the Concealed Carry Improvement Act ("CCIA"), which contains a number of provisions that the

---

[2] *Past Summary Ledgers*, Gun Violence Archive, https://www.gunviolencearchive.org/past-tolls (last visited Feb. 2, 2023). The Gun Violence Archive defines a "mass shooting" as any incident where four or more people were shot, excluding the shooter. *See General Methodology*, Gun Violence Archive, https://www.gunviolencearchive.org/methodology (last visited Feb. 2, 2023).

State says will help prevent future acts of mass violence. *Amici* differ in their views on many of the CCIA's provisions, but all agree that requiring applicants for concealed-carry permits to provide the State with "a list of former and current social media accounts . . . from the past three years" violates the First Amendment. *See* N.Y. Penal Law § 400.00(1)(o)(iv).

Under the CCIA, the State will grant a concealed-carry permit only if the applicant possesses "good moral character"—that is, if the applicant is deemed to have "the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others." *Id.* § 400.00(1)(b). The State may obtain information about the applicant's moral character in a variety of ways, including through character references. *Id.* § 400.00(1)(o)(ii). The State will then use the applicant's social media accounts to "confirm" information received from those character witnesses concerning (1) the applicant's moral character and (2) whether the applicant has done anything to "suggest they are likely to engage in conduct that would result in harm to themselves or others." *Id.* § 400.00(1)(o)(ii), (o)(iv). To enable this review, the CCIA requires applicants to submit a list of all social media accounts they have used over the past three years, including pseudonymous accounts. *Id.* § 400.00(1)(o)(iv). While the statute does not define the term "social media," the term's plain meaning encompasses a wide range of sites that people use to connect with others online,

including dating sites like JDate, Christian Mingle, and Grindr; health-related sites like MyFitnessPal and CaringBridge; niche sites like Goodreads; and major platforms like Facebook, Twitter, and LinkedIn.

The social media registration requirement burdens well-established First Amendment rights in three ways. First, conditioning applicants' ability to obtain a concealed-carry permit on their willingness to register their social media accounts with the government burdens the applicants' rights of free speech and association. *See, e.g.*, *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301 (1965); *Shelton v. Tucker*, 364 U.S. 479, 490 (1960). Second, compelling applicants to disclose their pseudonymous accounts—including accounts they might use to avoid harassment, embarrassment, or retaliation for their online speech—burdens applicants' right to speak anonymously. *See, e.g.*, *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 166–67 (2002); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341–42 (1995). And third, requiring applicants to direct the State to information that may make it obvious what groups they belong to, what identities they hold, and what causes they support burdens applicants' right to associational privacy. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958).

In effect, the statute compels applicants to direct the State to a record of their online speech and associations. The natural and predictable result of this requirement is that applicants will refrain from speech or associations online that they fear may

6

be held against them in the application process or that they do not believe should be subject to government inspection. This is of urgent concern to *amici* gun owners' associations, which represent Asian Pacific Americans, African Americans, women, LGBTQ individuals, and politically active individuals—some of whom have particular reasons to distrust law enforcement and to fear the government's scrutiny of their online lives.

The social media registration requirement triggers—and fails—heightened First Amendment scrutiny. The State has not demonstrated that the uncertain endeavor of using social media posts to predict the future will do anything to meaningfully advance its goal of preventing gun violence, rather than simply inject explicit and implicit bias into the process. Moreover, the requirement is significantly overbroad, implicating a vast amount of protected speech and association that bears no relation to the State's policy goals. It applies to every applicant, regardless of whether the person's application or character references give rise to an individualized reason to believe that the applicant poses a threat to public safety. It also applies to every social media platform, irrespective of the fact that dating apps, fitness forums, and professional networking platforms (to take just a few examples) are highly unlikely to provide helpful information about an applicant's propensity to engage in violence. As the Second Circuit recently suggested, this kind of dragnet approach to compelled disclosure is generally not narrowly tailored and so usually

7

fails First Amendment scrutiny. *Cornelio v. Connecticut*, 32 F.4th 160, 175 (2d Cir. 2022).

Accordingly, because the social media registration requirement imposes a profound burden on expressive and associational freedoms without materially advancing the State's goal of preventing unlawful gun violence, it violates the First Amendment. *Amici* urge the Court to invalidate the provision, which is severable from the remainder of the statute.

## ARGUMENT

### I. The CCIA's social media registration requirement imposes significant burdens on applicants' First Amendment rights.

The social media registration requirement burdens applicants' First Amendment rights in three ways: by compelling registration of their social media accounts; by conditioning their eligibility for a permit on their willingness to surrender the right to speak anonymously online; and by undermining their ability to associate privately through pseudonymous accounts.

#### A. The requirement chills the exercise of First Amendment rights by compelling applicants to register their social media accounts.

The social media registration requirement burdens applicants' First Amendment rights by conditioning their ability to obtain concealed-carry permits on their willingness to register their social media accounts with the State. By mandating a list of all social media accounts, the State is requiring applicants not just to share

their usernames, but also to facilitate the State's access to all publicly available information associated with those accounts.

A vast amount of information about an applicant can be gleaned from even the existence of a particular account, not to mention the applicants' posts, pictures, videos, "likes," the lists of people and groups they follow, and their interactions with others. A past Facebook "event" may reveal that the applicant went to a Black Lives Matter protest in 2020, or a local candidate's rally in 2016, or that the applicant organized a fundraiser for—or against—abortion rights last spring. And depending on the social media account, this history of events attended, beliefs shared, and associations made could span a decade or longer. An applicant who created a Twitter account in 2008 would be enabling easy access to a fifteen-year history of tweets, retweets, replies, and likes. And the registration requirement is not limited to just one account: it extends to all social media accounts, no matter how niche the platform. *See* N.Y. Penal Law § 400.00(1)(o)(iv) (providing no definition for "social media"). An applicant's list of accounts could include accounts on major platforms like Facebook and Twitter, but also those on platforms like Goodreads (which allows users to share reviews of books they have read[3]) and CaringBridge (which allows users to document "[a] health journey of any kind—diagnosis, injury, illness,

---

[3] *About Goodreads*, Goodreads, https://perma.cc/U373-Z837 (last visited Feb. 2, 2023).

pregnancy complications, or other experiences"[4]). This "completely unlimited" inquiry would almost certainly implicate "relationships [that] could have no possible bearing" on the State's interest in preventing gun violence. *Shelton*, 364 U.S. at 488.

The mere existence of an account on a particular platform can reveal information about the applicant's sexual practices (dating apps like Grindr or Tinder), religious affiliation (JDate, Christian Mingle), or health status (online HIV/AIDS support groups). And as explained below, the applicant's chosen username could itself convey a message: consider the handle @ImpeachBiden or @effthepolice.

Taken together, the information that the registration requirement makes available to the State may paint a picture of the applicant so detailed that even their dearest friends or family may not have the same insight as the State would. And the State will learn about more than just the applicant: it will be reviewing information that implicates others, as well. Multiple members of *amicus* the Liberal Gun Club are concerned that the registration requirement would direct the State to sensitive information not just about themselves—including health and disability status—but also about others with whom they associate, including people who did not make the decision to apply for a concealed-carry permit.

---

[4] *About Us*, CaringBridge, https://perma.cc/RU5B-Q3P4 (last visited Feb. 2, 2023).

Especially for people who fear retribution, harassment, or violence, this prospect may be a significant deterrent to the exercise of First Amendment rights. Fearful of the State's surveillance, individuals may stop posting on social media, refrain from associating with certain people or groups online, delete their past posts, or perhaps decide that a permit is not worth the government's scrutiny of their online lives. For example, one New York-based member of *amicus* the DC Project typically posted political advocacy and criticism on her social media accounts several times per day. After the passage of the CCIA, the prospect of submitting her social media accounts with a concealed-carry application was so worrisome that she stopped posting about such topics for six months, ultimately deciding not to apply for a permit at all. *See also United States v. Jones*, 565 U.S. 400, 416 (2012) (Sotomayor, J., concurring) ("Awareness that the government may be watching chills associational and expressive freedoms. And the government's unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse."); *cf. Shelton*, 364 U.S. at 486 (explaining the "pressure . . . to avoid any ties which might displease" the government that was created by a requirement forcing teachers to disclose their associational ties).

The burdens imposed by the requirement are compounded by the fact that applicants do not know what kind of speech or which associations will cause the State to doubt the applicant's "good moral character": they are at the mercy of the

whims and vast discretion of the licensing officer. What kinds of posts would make a licensing officer think the applicant did not have "the essential character, temperament and judgement necessary to be entrusted with a weapon"? N.Y. Penal Law § 400.00(1)(b), (o)(iv). Clear and direct threats of violence would almost certainly be red flags for the reviewer, but what about the frequent use of profanity? A proclamation that "all cops are bastards"[5] or that "Black lives matter"? Evidence of an unorthodox sex life? Photos of a prized collection of guns? And what acts or statements would "suggest [applicants] are likely to engage in conduct that would result in harm to themselves or others"? *Id.* § 400.00(1)(o)(ii). Video of the applicant playing "shooter" games, like Call of Duty or Fortnite? Posts about recovering from an eating disorder? Pictures of the applicant boxing?

Moreover, applicants who frequently post criticism of law enforcement or hold differing views from licensing officers may have concerns about how that speech will be understood. For example, members of *amicus* the Liberal Gun Club are particularly worried about retribution related to their political views, concerned that their support of opposition candidates or political organizations that challenge those in power will be used against them.

---

[5] James Poulter, *How "ACAB" Became the Universal Anti-Police Slogan*, VICE News (June 8, 2020, 8:00 AM), https://perma.cc/K2NC-NFRB.

Applicants must also consider the risk that local officials will use their social media information for other purposes or fail to protect their information from hackers and other third parties. Although the government states that applicants' social media account information will be used only for a one-time check for the purpose of evaluating permit applications, State Def. Mem. of Law in Opp. to Pls.' Mot. for P.I. ("PI Opp. Memo") at 85 n.27, *Antonyuk v. Hochul*, 1:22-CV-0986 (GTS/CFH), 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022), ECF No. 48, nothing in the law precludes it from using the collected information for other purposes. *See generally* N.Y. Penal Law § 400.00. Indeed, the law provides that the State will retain records of granted license applications in a statewide database to which "local and state law enforcement shall have access . . . in the performance of their duties." N.Y. Penal Law § 400.02. The law is silent on how long applicants' information can be retained or for what other purposes it may be used. Concerns related to future monitoring will deepen the ongoing chilling effect, deterring applicants from freely engaging in speech and association online.

The Supreme Court has recognized the burden on First Amendment rights that results when individuals are required to give the government information about their associational ties as a condition of exercising a right or seeking a government benefit. *See, e.g.*, *Lamont*, 381 U.S. at 305 (invalidating a rule requiring individuals to inform the Post Office that they wanted to receive communist political propaganda

because it required individuals to perform "an official act . . . as a limitation on the unfettered exercise of [their] First Amendment rights"); *Shelton*, 364 U.S. at 481, 490 (holding that a state law requiring public school teachers to disclose all organizations to which they had belonged, paid dues, or made contributions violated the First Amendment right to free association). Such requirements chill the exercise of First Amendment rights and can have a particularly pronounced deterrent effect on certain vulnerable groups. *See Lamont*, 381 U.S. at 307 (explaining that the "requirement is almost certain to have a deterrent effect, especially as respects those who have sensitive positions" including teachers without tenure and certain other government employees).

The CCIA's social media registration requirement will inhibit the exercise of First Amendment rights in much the same way that the disclosure requirements in *Lamont* and *Shelton* did. Indeed, although those cases involved viewpoint discrimination that is not present here, it is notable that the disclosure requirement here is far broader than the ones that the Court considered in those cases. An applicant with an active Goodreads account, for example, could end up providing the State with a list of every book they have read over several years—from *The Communist Manifesto* to *White Fragility* to *Fifty Shades of Grey*—and what the applicant thought about them. And an applicant's social media accounts may also

14

reveal information about their associational ties, *Shelton*, 364 U.S. at 481, 488, along with a host of other information about the strength of those ties.

### B. The social media registration requirement burdens the rights of applicants to speak anonymously and associate privately online.

The registration requirement also unconstitutionally conditions the ability to obtain a concealed-carry permit on an applicant's willingness to disclose pseudonymous account handles, and to surrender their rights to speak anonymously and associate privately online. These rights are vital aspects of free speech, particularly for marginalized communities and those who speak critically about the government.

Pseudonymous social media accounts allow individuals—concealed-carry applicants included—to explore their sexualities, navigate abusive relationships, document professional wrongdoing, exercise their faiths, organize protests, share advice, and much more—all while protecting themselves from the harassment, embarrassment, violence, or retribution that could occur if others were to learn their identities. Indeed, one reason the First Amendment protects anonymity is because it often allows individuals to communicate publicly about issues they could otherwise discuss only privately. *See Talley v. California*, 362 U.S. 60, 64–65 (1960).

Individuals may also choose to speak anonymously and associate privately because they fear the government might retaliate against them if they were associated with certain social media accounts. For example, those who document

police misconduct on social media may do so pseudonymously for fear of becoming targets of similar violence. Former government employees may post online reviews of their employer under a pseudonym to avoid burning bridges. And current government employees may use pseudonymous online accounts to hide aspects of their identities—such as their sexual identities, political views, or religions—out of fear that they will be harassed at work if that information were to become known.

Those with controversial views may also seek to express them anonymously because they fear retribution from private individuals rather than from the government—a distinction that begins to blur in small towns, where licensing officials may be members of the applicant's community. Members of the *amici* gun owners' organizations speak pseudonymously to avoid ostracism or worse for a wide range of content, from abortion-rights advocacy to vaccine skepticism—but one common concern is that their gun-related advocacy will expose them, or their communities, to reprisal. For example, one member of *amicus* the DC Project does not publicly acknowledge her management of her local church's social media page out of fear that her gun-related advocacy will bring controversy to the church community.

The hazards posed by "an intolerant society," *McIntyre*, 514 U.S. at 357, mean that the rights of anonymous speech and private association are especially important for those whose identities, activities, or associations expose them to an increased

16

risk of harm. *See, e.g.*, J. Nathan Matias, *The Real Name Fallacy*, Coral by Vox Media (Jan. 3, 2017), https://perma.cc/ZT9T-YKQF. Perhaps unsurprisingly, studies show that women rely more heavily on pseudonymous identities than men do, often driven by a desire for safety and privacy online. *See, e.g.*, Alex Leavitt, *"This is a Throwaway Account": Temporary Technical Identities and Perceptions of Anonymity in a Massive Online Community*, Procs. of the 18th ACM Conf. on Comput. Supported Coop. Work & Social Computing 317, 324 (ACM ed., 2015).

For LGBTQ individuals, including members of *amicus* Operation Blazing Sword–Pink Pistols ("OBSPP"), online anonymity can be critical for online and offline safety. In fact, Pink Pistols—the shooting society that forms part of OBSPP—does not keep membership rolls to avoid the risk of unintentionally disclosing its members' queer identities. Disclosure could expose a person to a range of risks, from physical violence, to familial alienation, to verbal harassment. Anonymous and pseudonymous online spaces also allow transgender individuals to create online personas that better match their gender identities while they evaluate and navigate their transitions. Emily St. James, *Trans Twitter and the Beauty of Online Anonymity*, Vox (Sept. 23, 2020, 10:30 AM), https://perma.cc/2H5P-44KA. Through these online identities, they can access spaces to listen, learn, and express themselves without the risk of harassment and physical harm. *See Violence Against Trans and Non-Binary People*, VAWnet (2021), https://perma.cc/E2R6-M7Z6

(noting that 46% of respondents to the 2015 U.S. Transgender Survey were verbally harassed for their trans identity and 9% were physically attacked).

For members of racial and ethnic minorities, including members of *amici* the Asian Pacific American Gun Owners Association ("APAGOA") and the National African American Gun Association, online anonymity can provide shelter from harassment and discrimination. During the early days of the COVID-19 pandemic, online pseudonyms provided APAGOA's members with a respite while anti-Asian hate spiked both online and offline. At the same time, African Americans experienced a spike in online racial discrimination, with one study reporting that one in two Black adolescents experienced at least one incident of online racial discrimination between March and November 2020. Juan Del Toro & Ming-Te Wang, *Online Racism and Mental Health Among Black American Adolescents in 2020*, 62 J. Am. Acad. of Child & Adolescent Psychiatry 25, 32 (Jul. 18, 2022), https://perma.cc/3UN6-5YWE.

Online anonymity can also be crucial for domestic abuse survivors—often women—who need to protect their identities to stay safe. The ability to share stories, receive advice, and access resources pseudonymously is critical in enabling survivors of domestic abuse to leave their abusers and to protect themselves after they have left. *See, e.g.*, Sara Baker, *Why Online Anonymity is Critical for Women*, Women's Media Ctr. Speech Project (Mar. 11, 2016), https://perma.cc/4N2K-

KD9M. Several members of *amicus* the Liberal Gun Club, for example, reported using pseudonyms online to protect themselves or their children after having been abused, harassed, or stalked. Under New York's regime, a domestic abuse survivor who seeks a concealed-carry permit to protect herself once she leaves a violent ex-partner might be forced to turn over the very pseudonymous handles that she is using to coordinate her escape. This is even more alarming considering reports that a sizable number of domestic abusers are police officers. *See* Conor Friedersdorf, *Police Have a Much Bigger Domestic-Abuse Problem Than the NFL Does*, The Atlantic (Sept. 19, 2014), https://perma.cc/4WMH-4R2B.

Even the disclosure of handles for non-public accounts can reveal private information to the government. As noted above, the mere fact that an applicant has an account on a certain platform often conveys private information. *See* Section I.A. And usernames themselves can also reveal private information. Disclosing the use of a handle like "FireKathyHochul," "TheMilitaryAtheist," "RiseUpForAbortion," "Max_theDragQueen," "OldMarine2," or "MAGARedNation" conveys personal information, even if the user's privacy settings prevent the government from seeing any content they have posted.

The registration requirement imposes a substantial burden on anonymous speech rights even though applicants' social media handles are disclosed only to the government. *Shelton*, 364 U.S. at 486–87; *Cornelio*, 32 F.4th at 170. And the fact

that "only" the government knows a poster's identity will be cold comfort to applicants who work for the government or attend church with the sheriff. The notion that "Big Brother is watching" is all the more chilling when Big Brother is one's neighbor, boss, regular customer, or ex-boyfriend.

The Supreme Court has long recognized that the First Amendment protects the right to engage in anonymous and pseudonymous speech. In a world in which individuals are often forced to choose between "criticiz[ing] oppressive practices and laws either anonymously or not at all," protecting anonymity is key to protecting the freedom of speech. *Talley*, 362 U.S. at 64–65. The right to speak anonymously can be abused, as can any right. But as the Supreme Court has explained*,* the right is important because it allows speakers to participate in critical discourse without fear of "economic or official retaliation," "social ostracism," or invasion of privacy— whether at the hands of private individuals or the government. *McIntyre*, 514 U.S. at 341; *see also Watchtower Bible*, 536 U.S. at 166–67; *NAACP*, 357 U.S. at 462– 63; *Buckley v. Valeo*, 424 U.S. 1, 64–65 (1976).

Similarly, the Supreme Court has recognized that the ability to associate privately is a prerequisite to the right to associate freely. In *NAACP v. Alabama ex rel. Patterson*, the Court acknowledged that forcing individuals to disclose their associations can be an "effective . . . restraint on freedom of association." 357 U.S. at 462. And as the Court has more recently explained, it does not matter that "some

[individuals] might not mind . . . the disclosure of their identities to the State"; disclosure requirements "create[] an unnecessary risk of chilling" when they "indiscriminately sweep[] up the information" of those who wish to keep their associations private. *Ams. for Prosperity Found. v. Bonta (AFPF)*, 141 S. Ct. 2373, 2388 (2021) (citation omitted).

This Court recently reaffirmed the importance of anonymous speech and private association online when it reversed the dismissal of a challenge to a social media registration requirement similar to that included in the CCIA. *See generally Cornelio*, 32 F.4th 160. The law at issue in *Cornelio* required Connecticut residents who had been convicted of sex offenses to disclose to the state all of their "Internet communication identifiers," including "electronic mail address[es], instant message address[es] or other similar Internet communication identifier[s]." *Id.* at 167 (citation omitted). Registrants were also required to inform the state if they created new identifiers. *Id.* This Court determined that the challenge to the registration requirement should have been allowed to proceed because the government had not demonstrated that the requirement could survive heightened scrutiny. *Id.* at 172. This Court noted that the registration requirement was particularly suspect because it "prevent[ed] a registrant from speaking anonymously," emphasizing that the First Amendment protects anonymous speech "as much on the internet as in other fora," and that laws cannot avoid constitutional scrutiny because they require disclosure

21

"to the government rather than to the general public." *Id.* at 169–70 (citing *AFPF*, 141 S. Ct. at 2388).

By forcing applicants to disclose a list of all their social media accounts from the preceding three years, the CCIA's social media registration requirement conditions the right to be considered for a concealed-carry permit on applicants' willingness to surrender their rights to speak anonymously and associate privately. In doing so, it strips away the "shield from the tyranny of the majority," exposing applicants to potentially serious harms. *McIntyre*, 514 U.S. at 357; *see also Shelton*, 364 U.S. at 486.

## II. The social media registration requirement violates the First Amendment.

### A. The social media registration requirement is subject to heightened scrutiny.

Because the social media registration requirement "risks chilling online speech, anonymous and otherwise, it is subject to heightened scrutiny under the First Amendment." *Cornelio*, 32 F.4th at 170. In *Cornelio*, the Second Circuit left open the question of whether strict or intermediate scrutiny applies to a law requiring registration of "Internet communication identifiers," concluding that the plaintiff had stated a plausible First Amendment claim even under the lower bar of intermediate scrutiny. *Id.* at 170–72. The Supreme Court also left the question open in *AFPF*, holding that the disclosure requirement at issue there was subject to at least exacting

scrutiny, with three Justices in the majority arguing for exacting scrutiny, one Justice arguing for strict scrutiny, and two declining to take a side. *See AFPF*, 141 S. Ct. at 2383, 2390, 2391–92.

Likewise, this Court need not decide the level of scrutiny that applies in this case, because even if the social media provision is reviewed under exacting scrutiny, *see id.* at 2385, or intermediate scrutiny, as the government argues, *see Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994); PI Opp. Memo at 81, the provision violates the First Amendment.

### B. The State has not shown that the registration requirement directly and materially advances its interest in preventing unlawful gun violence.

Under intermediate scrutiny, the State bears the burden of demonstrating that the law is narrowly tailored to achieve a substantial government interest. *Turner*, 512 U.S. at 624. This means that the State "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* at 664. "When 'trenching on first amendment interests, even incidentally, the government must be able to adduce either empirical support or at least sound reasoning on behalf of its measures.'" *Cornelio*, 32 F.4th at 171 (quoting *Turner*, 512 U.S. at 666). The State has offered neither in this case.

The State has failed to demonstrate that social media assessments can meaningfully assist in predicting which applicants will go on to perpetrate

violence—even assuming that bad actors both apply for concealed-carry permits and submit complete lists of their social media accounts in the first place. To justify this dragnet requirement, the State relies on the flawed assertion that "social media is a frequent forum for 'leakage' previewing intent to use firearms to cause harm," citing the *amicus* brief of Dr. Jaclyn Schildkraut. Appellant Br. 43, ECF No. 95. But Dr. Schildkraut's conception of "leakage" is admittedly "broad," including "clues" such as "feelings, thoughts, attitudes, or intentions," as well as "subtle threats, boasts, or innuendos." Schildkraut Amicus Br. 5, ECF No. 199-2. This category is so expansive that it encompasses speech uttered and posted by countless people every day, almost all of whom never go on to commit any violence. Dr. Schildkraut herself refers to social media leakage as only "*potentially* predictive," *id.* at 2 (emphasis added), relying on backward-looking examples while glossing over the difficulty of discerning intent ahead of time.

Looking backward and suddenly seeing signs is one thing; predicting the future is quite another, particularly in the context of social media. Language barriers, a lack of cultural context, and the risk of misinterpreting sarcasm and hyperbole all make interpreting social media posts difficult. One member of *amicus* the Liberal Gun Club is particularly concerned that social media activity will be misconstrued; as a member of the press, that person uses social media to follow controversial

groups with which they disagree and fears that the views of those groups would be wrongly attributed to them.

Risks of misinterpretation are not merely hypothetical. Consider the case of an Irish 26-year-old. According to the New York Times, the individual "joked on Twitter that he was going to 'destroy America' during his trip—an apparent reference to partying—as well as dig up the grave of Marilyn Monroe—a joke." J. David Goodman, *Travelers Say They Were Denied Entry to U.S. for Twitter Jokes*, N.Y. Times (Jan. 30, 2012, 1:03 PM), https://perma.cc/7X7Z-4LBQ. After reviewing his social media, however, border agents detained him overnight in the airport and then sent him back to Europe. *Id.*

Non-verbal communication on social media further complicates the task. Emojis, hearts, likes, and other reactions can take a range of meanings, making it nearly impossible for an outside reviewer to discern the user's intent. One tweet reading "in my 'i wanna die' era" was liked 58,400 times and retweeted 20,200 times. @keepingpain, Twitter (Sept. 26, 2022, 10:01 PM), https://perma.cc/2GX6-P4Z5. How would a licensing officer assess the tweeter's likelihood of causing harm to themself or others? What about individuals who retweeted the original post? What about those who simply "liked" it? The discretion inherent in this assessment will invite arbitrary and discriminatory decisions, as reviewers' implicit or explicit biases

25

warp their perceptions.[6] *See, e.g.*, Desmond Upton Patton, et al., *Stop and Frisk Online: Theorizing Everyday Racism in Digital Policing in the Use of Social Media for Identification of Criminal Conduct and Associations*, 3 Soc. Media & Soc'y 1, 5–7 (2017), https://journals.sagepub.com/doi/epub/10.1177/2056305117733344 (discussing "everyday racism in social media policing").

In sum, while the State implies that this inquiry would be straightforward, preventing violence through a social media registration requirement relies on a long series of "ifs": (1) If the person who seeks to commit violence is at least 21 years old and eligible to apply for a concealed-carry permit; (2) if that person actually complies with the law and applies for a concealed-carry permit; (3) if that person complies with the social media registration requirement on the application by providing all of their social media account handles; (4) if that person indicates their

---

[6] A similar concern underpins recent efforts to limit the use of rap lyrics in criminal proceedings. As one judge wrote, the use of rap lyrics "'primed the jurors' implicit bias regarding negative character evaluations of African American men as rap artists and as being associated' with criminal behavior." Michael Levenson, *Judge Overturns Murder Convictions, Citing Use of Rap Lyrics at Trial*, N.Y. Times (Oct. 4, 2022), https://www.nytimes.com/2022/10/04/us/california-racial-bias-gary-bryant-diallo-jackson.html. In other cases, mere support of a cause at odds with the reviewer's own beliefs has been enough to rouse suspicion. Indeed, in one instance, a Black civil rights attorney was reportedly targeted for government digital surveillance after using the #BlackLivesMatter hashtag on Twitter. Chris Lehman, *Oregon Settles Lawsuit, Forces Out DOJ Civil Rights Attorney*, OPB (Oct. 11, 2017, 7:35 PM), https://perma.cc/U5QP-TBNV. According to the report, the investigator believed that posts "related to the hip-hop group Public Enemy" were "something potentially dangerous." *Id.*

plans on social media at all; (5) if that person indicates their plans on public-facing social media accounts and not ones set to "private"; (6) if that person posts about their plans long enough in advance of carrying them out that the information could be captured by the social media review; (7) if that person does not delete such posts from their accounts or change their privacy settings to circumvent the requirement; (8) if the licensing officer actually comes across those specific posts among the vast amount of other information the applicant has available on social media; (9) if the licensing officer correctly identifies those posts as disqualifying; and (10) if the denial of the concealed-carry license then deters the individual from carrying out their plans, only *then* will the social media registration requirement have served its purpose of preventing unlawful gun violence. Given this long chain of "ifs," the State has not shown that the registration requirement directly and materially advances its interest in preventing unlawful gun violence.

### C. The social media registration requirement is not narrowly tailored.

The provision fails intermediate scrutiny for another independent reason: the requirement "burden[s] substantially more speech than is necessary to further the government's legitimate interests" and is thus not narrowly tailored. *Turner*, 512 U.S. at 662.

As with the registration requirement found to be "plausibly . . . overbroad" in *Cornelio*, this requirement applies to "a broad class beyond those who are likely to

engage in the conduct the government seeks to deter." *Cornelio*, 32 F.4th at 175. It requires law-abiding applicants who have otherwise given officials no cause for concern to turn over a vast amount of personal information and, in the process, reveal a detailed portrait of their lives.

The law also requires applicants to submit a broad range of social media accounts that have no plausible connection to the State's policy goals. The law requires applicants to submit a list of *all* social media accounts they have used over the past three years. *See* N.Y. Penal Law § 400.00(1)(o)(iv). On its face, it applies not just to Facebook, Instagram, and Twitter, but also to platforms like OkCupid and MyFitnessPal. It is difficult to fathom what nexus an applicant's dating profile or details about their weight-loss struggles could have to their likelihood of committing violence. *See Shelton*, 364 U.S. at 488 (explaining that many of the associational ties required to be disclosed "could have no possible bearing upon" the state's inquiry). The requirement is thus "'significantly overinclusive' rather than narrowly tailored." *Cornelio*, 32 F.4th at 175 (quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121 (1991)).

As the Supreme Court has explained, "[t]o meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014).

28

Critically, the State has not shown that other, less invasive methods of assessing eligibility to carry a concealed gun are insufficient for its purposes. In particular, the State has not explained why the social media registration requirement could not be limited to "those persons likely to engage in [the targeted] conduct," *Cornelio*, 32 F.4th at 175—such as applicants whose background checks, personal interviews, or character references have given rise to an individualized basis for further scrutiny. *Cf. Terry v. Ohio*, 392 U.S. 1, 21 (1968) (requiring a law enforcement officer "to point to specific and articulable facts which . . . reasonably warrant [an] intrusion" upon constitutionally protected interests).

Based on the record before this Court, the dragnet collection of social media information mandated by this law goes far beyond what is necessary. *United States v. Cotterman*, 709 F.3d 952, 966 (9th Cir. 2013) ("It is the potentially unfettered dragnet effect that is troublesome."); *see also Shelton*, 364 U.S. at 488 ("The breadth of legislative abridgement must be viewed in the light of less drastic means for achieving the same basic purpose.").

Accepting a social media registration requirement in this context would open the door to similar requirements in any number of other situations. Motor vehicles, for example, are a leading cause of death and injury in the United States. *Global Road Traffic Injuries and Deaths—A Global Problem*, Ctr. for Disease Control & Prevention (Jan. 10, 2023), https://perma.cc/HD2E-XD3S. Many accidents are

caused by road rage, drunk driving, or otherwise reckless behavior. If the State's logic holds, it could easily require every applicant for a driver's license to turn over their social media handles to allow the government to assess whether they have the appropriate "temperament" to get behind the wheel. This Court should reject the State's invitation to set a precedent for these kinds of broad intrusions on individuals' First Amendment rights.

Ultimately, because "a substantial number" of the challenged statute's "applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep," the provision is unconstitutionally overbroad. *AFPF*, 141 S. Ct. at 2387 (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)). As the Second Circuit explained in *Cornelio*, the Constitution requires the State to do more to meet its burden when First Amendment rights are at stake. 32 F.4th at 175–76. The State has failed to meet that burden here.

## CONCLUSION

The Second Circuit should affirm the district court's grant of a preliminary injunction barring the enforcement of the social media registration requirement, N.Y. Penal Law § 400.00(1)(o)(iv).

February 8, 2023                                    Respectfully submitted,

                                                        */s/ Anna Diakun*
                                                     Anna Diakun
                                                     Katherine Fallow
                                                     Alex Abdo

Knight First Amendment Institute at
  Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
anna.diakun@knightcolumbia.org

*Counsel for* Amici Curiae

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of the Court of Appeals for the Second Circuit Local Rules 29.1(c) and 32.1(a)(4)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 6,987 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)(6) because it was prepared using Microsoft Word in 14-point Times New Roman font, a proportionally spaced typeface.

Dated: February 8, 2023      */s/ Anna Diakun*
              Anna Diakun